COTTER CORPORATION, Denver-Golden Corporation, and Joseph W. Walsh, Appellants,

v.

Glenn T. SEABORG, Chairman, Atomic Energy Commission, John G. Palfry, Commissioner, Atomic Energy Commission, James T. Ramey, Commissioner, Atomic Energy Commission, Gerald F. Tape, Commissioner, Atomic Energy Commission, Mary I. Bunting, Commissioner, Atomic Energy Commission, Robert Hollingsworth, General Manager, Atomic Energy Commission, George F. Quinn, Assistant General Manager, Atomic Energy Commission, Rafford L. Faulkner, Director, Division of Ray Materials, Atomic Energy Commission, and Allan E. Jones, Manager, Grand Junction Office, Atomic Energy Commission, Appellees.

No. 8418.

United States Court of Appeals
Tenth Circuit.

Dec. 28, 1966.

Elmer E. Batzell, Washington, D. C. (Robert G. Nunn, Jr., Edward J. Mc-Grath, Washington, D. C., Holme, Roberts & Owen, Donald C. McKinlay and Edward M. Heppenstall, Denver, Colo., on the brief), for appellants.

Florence Wagman Roisman, Atty., Dept. of Justice (Barefoot Sanders, Asst. Atty. Gen., Lawrence M. Henry, U. S. Atty., and David L. Rose, Atty., Dept. of Justice, on the brief), for appellees.

Before MURRAH, Chief Judge, and ALDRICH * and HILL, Circuit Judges.

HILL, Circuit Judge.

Appellants brought suit in the United States District Court for the District of Colorado against the Chairman, Commissioners, and other officials of the Atomic Energy Commission in their individual capacities. The complaint sought declaratory judgment and injunctive relief.

The District Court, after hearing extensive argument, dismissed the action because: 1) The Complaint seeks to require the United States Government to contract for and purchase uranium concentrate, relief which the court has no authority or jurisdiction to grant, thus the complaint does not state a cause of action upon which relief can be granted, and 2) it is an unconsented suit against the United States, barred by virtue of the federal government's sovereign immunity. From the order dismissing their complaint, appellants take this appeal.

Because appellants contend the Commission officials have acted ultra vires their authority a somewhat detailed statement of the factual background of this case is essential to an understanding of the legal issues involved. Since its establishment in 1947, the Atomic Energy Commission has had the primary responsibility for the development and

---

* Sitting by designation.

production of an arsenal of nuclear weapons for this Nation's defense. The Commission has been "authorized and directed" by Congress to "purchase, take, requisition, condemn, or otherwise acquire supplies of source material," including uranium.[1] The Commission has also been empowered to "establish guaranteed prices for all source material delivered to it within a specified time." [2] To provide incentive to develop domestic sources of uranium, the Atomic Energy Commission, in 1948, announced that it would guarantee certain purchase prices for domestic uranium.

At an early stage in the uranium procurement program, the Commission determined that it should try to satisfy its uranium needs by purchasing uranium concentrates rather than raw, un-processed ore. It therefore made purchases of the concentrates through individually negotiated contracts for the construction and operation of privately owned domestic mills which, under the contracts, would process uranium concentrates and sell them to the Atomic Energy Commission. Under the program, the privately owned mills buy directly from the ore miners.[3] The Atomic Energy Commission, in its contracts with the mills, provided the price at which the mills would buy ore from the miners as well as the price the Atomic Energy Commission would pay the mills for the concentrate. These incentive programs were to expire on March 31, 1962. To insure an adequate supply thereafter, the Atomic Energy Commission, in a press release of May 24, 1956, announced that it would, for the period April 1, 1962, through December 31, 1966, guarantee a market for "all uranium concentrates produced by domestic mills from domestic ores." [4] The announcement also stated that the "present uranium procurement program will remain in effect until March 31, 1962."

Apparently the response to the procurement program exceeded the Commission's expectation for in 1957 the domestic uranium ore supplies were in excess of the amount the government could use. As a consequence, the Commission announced on October 28, 1957, that it no longer would guarantee a market for all domestic uranium. Because of the economic hardship this policy imposed on certain uranium areas, including the Colorado Front Range where appellants operate, the Commission, on April 2, 1958, announced that it would "expand to a limited extent domestic uranium procurement" in order to "provide an additional market for ore reserves developed prior to November 1, 1957." The Commission stressed the fact that over-expansion of the uranium production facilities should be avoided and that "new capacity provided through purchase contracts should be held to the minimum."

On November 24, 1958, the Commission announced its new guarantees and this press release announcement is at the heart of the appellants' contentions. As applicable to this case, it reads as follows:

"Modification of USAEC 1962–1966 Uranium Program

"The United States Atomic Energy Commission: Notice is hereby given of modification of the 1962–1966 domestic uranium concentrate procurement program.

"1. On May 24, 1956, the Atomic Energy Commission announced that it would guarantee the purchase of $U_3O_8$ in concentrates produced and delivered during the period April 1, 1962–December 31, 1966. The Commission will carry out its May 24, 1956, commitment with respect to ore reserves developed prior to this date in reliance upon the May 24, 1956, announcement by negotiating for the purchase

---

1.  42 U.S.C. § 2096(a).

2.  42 U.S.C. § 2096.

3.  Some mill owners do also own and operate mining operations.

4.  Certain limitations were attached which are not important here.

of appropriate quantities of concentrates derived from such ore reserves during the 1962–1966 period. Such purchases will be at the previously established price of $8.00 per pound for $U_3O_8$ in an acceptable concentrate." [5]

To effectuate this program, the Commission had to determine what quantity of ore reserves had been "developed prior to this date," i. e., November 24, 1958. This they did by using certain unchallenged measurement procedures. The ore reserves thus determined were called "Allocations" and the amount of ore concentrate the Commission, by contracting with the various mills, agreed to purchase from the mills—that is, that ore developed prior to November 24, 1958—was called "eligible ore". It will be remembered that this "eligible ore" was to be delivered to the Commission during the period April 1, 1962, through December 31, 1966.

On November 17, 1962, the Commission announced its procurement program for the period January 1, 1967, through December 31, 1970.[6] The Commission's projected requirements for this period were considerably less than the amounts of uranium which would be available if domestic operations continued through the 1967–1970 period at the "current" production levels. Therefore, the Commission announced the "stretch-out" program. Under this program, the mills could defer, until after 1966, delivery of a portion of the "eligible ore" they had contracted to deliver during the 1962–1966 period. Under the program, the mills were invited to submit proposals on the amounts of concentrate in their present contracts with the Atomic Energy Commission which they would be willing to defer delivery of until after 1966. The Commission retained the right to reject any and all proposals. If the proposal was approved, the mill could make delivery of the "eligible ore" during 1967 and 1968, and, the Commission would, in addition, purchase during 1969 and 1970 an amount equal to that delivered during 1967 and 1968. The announcement expressly provided that "with respect to deliveries before January 1, 1969, [that is, during the 1967–1968 period] all proposals must be limited to $U_3O_8$ in concentrates produced from ores derived from property units which are determined by the Atomic Energy Commission to be eligible under the November 24, 1958, announcement * * *." The effect of this provision is this: Any mill owner who sells concentrates to the government must have an ore supplier who has some ore sources which were developed prior to November 24, 1958, if that mill owner and the producer are to participate in the "stretch-out" program. The appellant ore producer Walsh has no remaining ore sources which were developed prior to November 24, 1958. Thus, neither he nor appellant Cotter, a mill operator, can participate in the "stretch-out" program.

With this general background statement, we turn to the relationship between the Commission and the appellants. Appellant Cotter is a uranium mill own-

---

5. The announcement also provided:

  "2. By issuance of this announcement the Atomic Energy Commission hereby withdraws prospectively the concentrate purchase program announced May 24, 1956. * * * Future programs will give due consideration to the adequacy of domestic ore reserves, the need for exploration and development, the maintenance of the domestic uranium industry, and other factors which may be important to the atomic energy program.

  *   *   *   *   *

  "4. Under this revised program, the Commission's 1962–1966 domestic uranium concentrate purchases from ore reserves already developed will be limited to:

  *   *   *   *   *

  "c. New milling contracts or amendments to existing contracts which may be executed pursuant to the Commission's April 2, 1958, announcement of the limited expansion of the domestic uranium procurement program;

  *   *   *   *   *."

6. January 1, 1967, begins the period after the end of the program announced May 24, 1958, and amended by the announcement of November 24, 1958, the latter program covering the period April 1, 1962, through December 31, 1966.

er and operator.[7] In 1957, Cotter and the Commission entered into a contract under which Cotter, using its own funds, constructed a small uranium processing plant—a mill—in Colorado. The Commission purchased the uranium concentrates produced by Cotter at the plant. Subsequently, a new contract was entered into, on December 17, 1959, under which Cotter, using its own monies, expanded the capacity of the processing plant from 50 [8] to 200 tons of ore per day. Included in this 1959 contract were provisions whereby the Commission could carry out its program announced November 24, 1958, by providing that the allocations of ore eligible to be processed into concentrate must have been developed prior to November 24, 1958. The government then agreed to purchase certain prescribed amounts of ore during the contract's effective period. That period was March 1, 1960, through February 28, 1965. Appellant Walsh is one of the producers who supplies ore to appellant Cotter. Walsh is, of course, limited in participating in the government program by the contractual provision which limits Cotter's operation to that eligible ore developed prior to November 24, 1958. Cotter processed all the ore developed by Walsh within the period of its contract ending February 28, 1965. On February 25, 1965, Cotter and Walsh filed this suit in the United States District Court seeking a declaratory judgment and injunctive relief.

The complaint asks that the District Court rule: "(1) That the Rule of May 24, 1956 was applicable to appellants from March 1, 1960 to April 1, 1962; (2) that it provided the basis upon which appellees should have dealt with appellants; (3) that the Rule of November 24, 1958 was by its terms prospective only and effective only from and after April 1, 1962; (4) that paragraph 1 of that Rule was and is by its terms inapplicable to appellants; (5) that after April 1, 1962, the allocations established by appellees for appellants were and are governed by paragraphs 2 and 4c of that Rule and; (6) that the allocations imposed by appellees on appellants pursuant to said paragraphs must be based upon reserves determined as of a date not earlier than February 29, 1960."

In this court appellants say essentially the same thing but use a lot more verbiage in saying it. They contend that by issuing the announcements of May 24, 1956, November 24, 1958, and November 17, 1962, which were all published in the Federal Register, the Commission established a "regulatory scheme" which the Commission is bound to follow. Appellants contend that this "regulatory scheme", which they concede was validly promulgated pursuant to the Atomic Energy Act, assures to "all the opportunity to participate in the Uranium Procurement Program from the end of 1966 through 1970." Appellants contend that by refusing them an "equal opportunity" to participate in the program, the appellees are acting illegally and contrary to the "regulations which they themselves promulgated." Thus, the appellants contend: "It is the illegal actions of appellees as respects appellants that are challenged, not the statute or the regulatory scheme. The action is therefore not against the United States, but against appellees." What this whole argument ignores, of course, is the fact that appellants have no more "eligible ore" to sell to the Commission. That is why they cannot participate in this program. Thus the decisive question in this case boils down to a determination of whether the Commission acted within its Congressional authority in limiting the 1966–1970 program in terms of "eligible ore". If they were this suit is barred by the doctrine of sovereign immunity.

We conclude that the complaint was properly dismissed for the sole reason

---

7. Appellant Cotter also has some mining facilities and mines some uranium ore but its "principal profit-making activity is the production of uranium concentrate."

8. Appellant says 72.

that the action is an unconsented suit against the sovereign United States of America.

■ The Atomic Energy Act is the source of the Commission's power to act in a governmental capacity. Section 2096 of the Act, 42 U.S.C., gives the Commission the power to acquire source material,[9] which includes uranium ore and uranium concentrates.[10] 42 U.S.C. § 2201 sets out the general duties of the Commission. Section (b) gives the Commission authority to: "(b) establish by rule, regulation, or order, such standards and instructions to govern the possession and use of special nuclear material, source material, and by product material as the Commission may deem necessary or desirable to promote the common defense and security or to protect health or to minimize danger to life or property."

■ It cannot be doubted that the Commission members acted within their authority when they limited the ore which Cotter was to deliver to that ore which Cotter's suppliers had developed prior to November 24, 1958. See Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628. This limitation thus prohibits appellant from participating in the "stretch-out" program.

■ The Commission, when it made its announcement of November 24, 1958, limiting uranium procurement for the 1962–1966 period, was doing exactly what it was told by Congress to do. By limiting its duty to carry out its May 24, 1956 commitment to those "ore reserves developed prior to this [November 24,

1958] date in reliance upon the May 24, 1956, announcement" the Commission exercised the discretion given it by Congress to acquire source material. 42 U.S.C. §§ 2096 and 2201(b). What was said in Wells v. Roper, 246 U.S. 335, 337, 38 S.Ct. 317, 62 L.Ed. 755 is applicable here: "The [appellant's] argument * * assumes to treat defendant, not as an official, but as an individual who, although happening to hold public office, was threatening to perpetuate an unlawful act outside of its functions. But the averments of the bill make it clear that defendant was without personal interest and was acting solely in his official capacity and within the scope of his duties. Indeed, it was only because of his official authority that plaintiff's interests were at all endangered by what he proposed to do." See also United States ex rel. Goldberg v. Daniels, 231 U.S. 218, 34 S.Ct. 84, 58 L.Ed. 191.

■ Since the appellees were acting within the scope of their Congressionally delegated authority when they issued and carried out the regulations of which appellants complain, their actions were the sovereign's actions.[11] What appellants request "would require the [government official's] official affirmative action, [and] affect the public administration of government agencies * * *."[12] This suit is thus a suit against the United States since it is "well settled that whether an action is one against the sovereign is determined not by the party named as defendant, but by the result of the judgment or decree which may be entered."[13] A suit may not be brought and maintained against the United States without

9. See 42 U.S.C. § 2014(x) for a definition of "source material" as used in the Act.

10. "The Commission is authorized and directed, to the extent it deems necessary to effectuate the provisions of this chapter—
    (a) to purchase, take, requisition, condemn, or otherwise acquire supplies of source material; * * *."

11. Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682 at 689, 690, 69 S.Ct. 1457, 93 L.Ed. 1628; Pan American Petroleum Corporation v. Pierson, et al., 10 Cir., 284 F.2d 649.

12. State of Hawaii v. Gordon, 373 U.S. 57, 83 S.Ct. 1052, 10 L.Ed.2d 191.

13. State of New Mexico, et al. v. Backer, et al., 10 Cir., 199 F.2d 426 and cases there cited.

its consent.[14] The United States has not consented to this suit.[15] The District Court properly dismissed the complaint.

Most of appellants' initial and supplementary briefs were devoted to matters other than the threshold issue of whether appellees were acting within their Congressionally delegated authority, thus barring the suit because of sovereign immunity. Because we affirm the case on this narrow ground, we do not deal with the other issues raised.

Affirmed.

---

14. Dugan, et al. v. Rank, et al., 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15; State of Hawaii v. Gordon, 373 U.S. 57, 83 S.Ct. 1052, 10 L.Ed.2d 191; Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628; United States v. Mel's Lockers, Inc., 10 Cir., 346 F.2d 168; Chournos, et al. v. United States, et al., 10 Cir., 335 F.2d 918; State of New Mexico, et al. v. Backer, et al., 10 Cir., 199 F.2d 426.

15. Appellants have relied upon 28 U.S.C. § 1331 as giving the court jurisdiction to hear this suit but that statute does not waive the sovereign's immunity. See Anderson v. United States, 5 Cir., 229 F. 2d 675. And since the court has no jurisdiction to hear this unconsented suit, the Administrative Procedure Act, relied upon by appellants to give them standing, does not improve their position. See Chournos, et al. v. United States, et al., 10 Cir., 335 F.2d 918.