# NATIONAL LABOR RELATIONS BOARD *v.* NASH-FINCH CO., ᴅʙᴀ JACK & JILL STORES

No. 70–93.  Argued October 19, 1971—Decided December 8, 1971

*Lawrence G. Wallace* argued the cause for petitioner. On the briefs were *Solicitor General Griswold, Peter L. Strauss, Dominick L. Manoli, Norton J. Come,* and *Peter G. Nash.*

*William A. Harding* argued the cause for respondent *pro hac vice.* With him on the brief was *Richard P. Nelson.*

*Solomon I. Hirsh* filed a brief for the Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, as *amicus curiae* urging reversal.

*Milton A. Smith, Jerry Kronenberg,* and *Gerard C. Smetana* filed a brief for the Chamber of Commerce of the United States as *amicus curiae* urging affirmance.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Title 28 U. S. C. § 2283 provides:

> "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

The question is whether the National Labor Relations Board may, through proceedings in a federal court, en-

join a state court order which regulates peaceful picketing governed by the federal agency. The District Court rejected the Board's contention that it is within the exception to § 2283,[1] recognized in *Leiter Minerals, Inc.* v. *United States,* 352 U. S. 220, as respects suits brought by the United States. The Court of Appeals affirmed. 434 F. 2d 971. The case is here on a petition for a writ of certiorari which we granted, 402 U. S. 928.

When a union began organizing employees of certain stores in Grand Island, Nebraska, the union filed unfair labor practice charges against the company. The General Counsel issued a complaint. A hearing was held and a Trial Examiner sustained the complaint and recommended that the company cease and desist. Shortly thereafter and before the Board had acted, the union picketed the stores. The company thereupon petitioned the Nebraska state court for an injunction. The state court issued a restraining order, limiting the pickets to two at each store, enjoining them from blocking or picketing entrances or exits and from distributing literature pertaining to the dispute which would halt or slow traffic, from instigating conversations with customers in any manner relating to the dispute, from mass picketing, from acts of physical coercion against persons driving to work, and from doing any act in violation of Neb. Rev. Stat. § 28–812, which makes unlawful "loitering about, picketing or patrolling the place of work . . . against the will of such person." The injunction also bans anyone other than a bona fide union ·member from picketing unless he becomes a defendant in the state proceedings. Finally, the injunction bars anyone, other than pickets and named defendants, from picketing, distributing handbills, or otherwise "caus[ing] to be pub-

---

[1] For the history of present § 2283 see H. R. Rep. No. 308, 80th Cong., 1st Sess., A181.

lished or broadcast any information pertaining to the dispute . . . between the parties."

Later the Board entered its decision and order accepting in part the Trial Examiner's recommendations and rejecting parts not material to the present controversy.

The Board then filed this suit in the Federal District Court seeking to restrain the enforcement of the state court injunction on the ground that it regulated conduct which was governed exclusively by the National Labor Relations Act. As noted, both the District Court and the Court of Appeals denied the Board relief. The Court of Appeals held that for the purposes of § 2283 the Board is "an administrative agency of the United States, and is not the United States." 434 F. 2d, at 975. Congress from the beginning has restricted the authority of the federal judiciary to interfere with state court actions. See *Younger* v. *Harris,* 401 U. S. 37, 43–44. The present § 2283 is a revision of earlier provisions of federal statutes which were construed to allow within limits such federal injunctions in favor of *federal agencies. Bowles* v. *Willingham,* 321 U. S. 503, 510. Any exception in favor of federal agencies must, however, be "implied," *ibid.,* unless it comes within the exceptions stated in § 2283.

It is suggested that this federal injunction was "in aid" of the jurisdiction of the federal court since the suit is in the District Court by reason of 28 U. S. C. § 1337 which grants jurisdiction over "any civil action or proceeding arising under any Act of Congress regulating commerce." In *Capital Service, Inc.* v. *NLRB,* 347 U. S. 501, an employer invoked the aid both of a state court and of the federal Board against picketing. The Board sought a federal court injunction under § 10 (l) of the Act, 29 U. S. C. § 160 (*l*), which specifically allows it wherever an unfair labor practice respecting a secondary boycott or picketing violative of § 8 (b)(4) or § 8 (b)(7)

of the Act is involved. We ruled that the state injunction "restrains conduct which the District Court was asked to enjoin in the § 10 (1) proceeding." *Id.*, at 505. We held that under those circumstances an injunction by the federal court was "necessary in aid of its jurisdiction" over commerce, because the federal court to exercise its jurisdiction "freely and fully" must "first remove the state decree." *Id.*, at 506.

In the instant case the company did not file any charges with the Board which claimed that the union's picketing violated § 8 (b)(4) or § 8 (b)(7) of the Act, 73 Stat. 542 and 544, 29 U. S. C. § 158 (b)(4) and § 158 (b)(7).

Section 10 (j) gives the District Court similar authority in respect of an unfair labor practice of the employer under § 8 (a)(1) of the Act which protects the right of employees to organize. But a resort to court action, the Board has held, does not violate § 8 (a)(1). See *Clyde Taylor Co.*, 127 N. L. R. B. 103, 109.

The action in the instant case does not seek an injunction to restrain specific activities upon which the Board has issued a complaint but is based upon the general doctrine of pre-emption. We therefore do not believe this case falls within the narrow exception contained in § 2283 for matters "necessary in aid of its jurisdiction." There is in the Act no express authority for the Board to seek injunctive relief against pre-empted state action. The question remains whether there is implied authority to do so.

It has long been held that the Board, though not granted express statutory remedies, may obtain appropriate and traditional ones to prevent frustration of the purposes of the Act. We held in *In re National Labor Relations Board*, 304 U. S. 486, 496, that even in the absence of an express statutory remedy, the Board might petition for writ of prohibition against premature invo-

cation of the review jurisdiction of the Court of Appeals. In *Amalgamated Workers* v. *Edison Co.,* 309 U. S. 261, we held that the Board had implied authority to institute contempt proceedings for violation of court decrees enforcing orders of the Board. In *Nathanson* v. *NLRB,* 344 U. S. 25, we found an implied authority of the Board to file claims in bankruptcy covering the sums included in its back-pay awards. The claims were not given priority under § 64 (a)(5) of the Bankruptcy Act, but this was because "the United States [was] collecting for the benefit of a private party," *id.,* at 28, not as suggested, *post,* at 149, because the Board's juridical status was something less than that of the United States.[2]

---

[2] The basis of our decision in *Nathanson* was that "[t]he priority granted by [§ 64 (a)(5), 11 U. S. C. § 104 (a)(5)] . . . was designed 'to secure an adequate revenue to sustain the public burthens and discharge the public debts.' " 344 U. S., at 27–28. Because there was "no function . . . of assuring the public revenue" and "[t]he beneficiaries of the claims [were] private persons," *id.,* at 28, we found it inappropriate to apply the priority for claims owing the United States and, instead, gave the claims the same "treatment tha[t] other wage claims enjoy[ed]." *Id.,* at 29. The suggestion that *Nathanson* is a stronger case for equating the status of the Board to that of the United States disregards both the policies of the Bankruptcy Act upon which we relied in that decision and the federal pre-emption which inheres in the present case.

Cases such as *Reconstruction Finance Corp.* v. *J. G. Menihan Corp.,* 312 U. S. 81, do not support a miserly interpretation of the Board's powers. There, we held that costs of litigation could be assessed against a corporation which Congress had launched into the commercial world with the power to "sue and be sued." Contrary to the dissent's assertion that the case turned on the failure of Congress to manifest an intent "to bestow the privileges and immunities of the United States on a federal agency," *post,* at 150, our decision there was based upon the grant of "the unqualified authority to sue and be sued [which] placed petitioner upon an equal footing with private parties as to the usual incidents of suits in relation to the payment of costs and allowances." 312 U. S., at 85–86.

We conclude that there is also an implied authority of the Board, in spite of the command of § 2283, to enjoin state action where its federal power pre-empts the field. Our starting point is contained in the observation of Mr. Chief Justice Hughes in *Amalgamated Workers* v. *Edison Co., supra,* at 265.

> "The Board as a public agency acting in the public interest, not any private person or group, not any employee or group of employees, is chosen as the instrument to assure protection from the described unfair conduct in order to remove obstructions to interstate commerce."

The purpose of the Act was to obtain "uniform application" of its substantive rules and to avoid the "diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies." *Garner* v. *Teamsters Union,* 346 U. S. 485, 490. The federal regulatory scheme (1) protects some activities, though not violence (see *United Mine Workers* v. *Gibbs,* 383 U. S. 715, 729–731), (2) prohibits some practices, and (3) leaves others to be controlled by the free play of economic forces. We said in *Garner* v. *Teamsters Union, supra,* at 500:

> "For a state to impinge on the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act prohibits."

In *Leiter Minerals, Inc.* v. *United States,* 352 U. S. 220, a state suit over mineral rights in public lands was pending, the parties being private persons. The United States brought suit in the federal court to quiet title to the mineral rights and sought and obtained a federal injunc-

tion against prosecution of the state proceedings. In holding that § 2283 impliedly allowed such an exception we said:

> "The statute is designed to prevent conflict between federal and state courts. This policy is much more compelling when it is the litigation of private parties which threatens to draw the two judicial systems into conflict than when it is the United States which seeks a stay to prevent threatened irreparable injury to a national interest. The frustration of superior federal interests that would ensue from precluding the Federal Government from obtaining a stay of state court proceedings except under the severe restrictions of 28 U. S. C. § 2283 would be so great that we cannot reasonably impute such a purpose to Congress from the general language of 28 U. S. C. § 2283 alone." *Id.,* at 225–226.

In *Leiter,* the United States brought suit under the authority of the Attorney General. Here it is the Board that moved to prevent "irreparable injury to a national interest." The Board is the sole protector of the "national interest" [3] defined with particularity in the Act. *Leiter,* of course, was initiated by the Attorney General; but underlying the controversy were federal agencies in the Department of the Interior responsible for administration of the public lands. The fact that the moving party was a federal agency, not the Attorney General, was

---

[3] *Amalgamated Clothing Workers* v. *Richman Bros. Co.,* 348 U. S. 511, held that a *private party* under the protection of the Board's order could not obtain injunctive relief in a federal court against an anti-picketing order issued by a state court. And see *Atlantic Coast Line R. Co.* v. *Brotherhood of Locomotive Engineers,* 398 U. S. 281.

considered irrelevant in *Bowles* v. *Willingham, supra,* where the Administrator of the Emergency Price Control Act sued to enjoin a state court from interfering with orders of the federal agency. An exception from the general ban on federal injunctions against state court action was implied by reason of the fact that the method of review of the orders of the federal agency was in the Emergency Court of Appeals. But there was no suggestion that suit by or against the Administrator was not a suit of the United States.[4] The purpose of § 2283 was to avoid unseemly conflict between the state and the federal courts where the litigants were private persons, not to hamstring the Federal Government and its agencies in the use of federal courts to protect federal rights. We can no more conclude here than in *Leiter* that a general statute, limiting the power of federal courts to issue injunctions, had as its purpose the frustration of federal systems of regulation. See *Brown* v. *Wright,* 137 F. 2d 484, 488. The frustration of superior federal interests by the general language of § 2283 cannot reasonably be imputed. See *NLRB* v. *Sunshine Mining Co.,* 125 F. 2d 757, 762; *NLRB* v. *New York State Board,* 106 F.

---

[4] Actions against the National Labor Relations Board are dismissed on the ground that they are against a federal agency exercising a governmental regulatory function and so are suits against the United States, which cannot be sued without the consent of Congress. *Clover Fork Coal Co.* v. *NLRB,* 107 F. 2d 1009. The same holds for the Atomic Energy Commission, *Cotter Corp.* v. *Seaborg,* 370 F. 2d 686; the Civil Service Commission, *Soderman* v. *U. S. Civil Service Commission,* 313 F. 2d 694; the Veterans Administration, *Evans* v. *U. S. Veterans Admin. Hospital,* 391 F. 2d 261; and the Securities and Exchange Commission, *Holmes* v. *Eddy,* 341 F. 2d 477. Similarly, an action by the Director General of Railroads was held to be on behalf of the United States and thus was not barred by the relevant statute of limitations. *Davis* v. *Corona Coal Co.,* 265 U. S. 219.

Supp. 749, 752; *NLRB* v. *Industrial Commission*, 84 F. Supp. 593, aff'd, 172 F. 2d 389.

The fact that the Board is given express authority to seek enforcement of its orders in some sections of the Act[5] is not persuasive that the Act expresses a policy to bar the Board from enforcing the national interests on other matters. The instances where the Board is given explicit authority to seek the aid of federal courts are not exclusive examples, as we have already shown. They are only particularized instances of specific enforcement devices relating to specified orders, not a denial by implication that the Act and the Board would not be entitled to federal aid or protection in other instances, as illustrated by *In re National Labor Relations Board, supra; Amalgamated Workers* v. *Edison Co., supra;* and *Nathanson* v. *NLRB, supra.* The exclusiveness of the federal domain is clear; and where it is a public authority that seeks protection of that domain, the way seems clear. For the Federal Government and its agencies, the federal courts are the forum of choice. For them, as *Leiter* indicates, access to the federal courts is "preferable in the context of healthy federal-state relations." 352 U. S., at 226.

Whether there are parts of the state court injunction

---

[5] Congress has vested the Board with broad powers to seek injunctive relief in the district courts. Section 10 (1), 29 U. S. C. § 160 (*l*), for example, gives the Board power to obtain an injunction where an investigation produces reasonable cause to believe that a charge of secondary boycott or illegal picketing activity is true. Section 10 (j), 29 U. S. C. § 160 (j), provides a similar basis of power for other unfair labor practices. "In case of contumacy or refusal to obey a subpena issued to any person" during "hearings and investigations, which, in the opinion of the Board, are necessary and proper for the exercise of [its] powers" under §§ 9 and 10, 29 U. S. C. §§ 159 and 160, the Board may seek injunctive relief from a district court requiring compliance. 29 U. S. C. § 161 (2).

that should survive our reversal of the judgment below is a question we do not reach. It will be open on the remand of the cause.

*Reversed and remanded.*

MR. JUSTICE WHITE, dissenting.

## I

The National Labor Relations Board here sues in federal court to enjoin the enforcement of a state court injunction against picketing.[1] Title 28 U. S. C. § 2283 bars such injunctions except in specified situations. One exception permits injunctions by a federal court which are "necessary in aid of its jurisdiction." The majority rightfully concedes that this exception is inapplicable

---

[1] Although the Board had held an unfair labor practice hearing and had found the employer guilty of certain unfair labor practices while exonerating it of others, this proceeding is not relevant to the issues in the present case because it did not concern the union's picketing. The union had originally filed a complaint and an election petition with the Board, charging the employer with a refusal to bargain and with interfering with the employees' rights to organize. A complaint was issued, and a hearing held. The trial examiner on April 28, 1969, found the employer guilty of certain § 8 (a) (1) and § 8 (a) (5) unfair labor practices and entered a cease-and-desist order against certain activities of the employer. A month after the trial examiner's decision, the union began its picketing, and the employer then secured the state court injunction limiting the picketing that is at issue in this case. On August 29, 1969, the Board filed a complaint in federal district court seeking to restrain the employer from enforcing the state court injunction. On September 17, 1969, the Board reversed the decision of the trial examiner and held that the employer was not guilty of a § 8 (a) (5) refusal to bargain nor of certain of the § 8 (a) (1) violations the trial examiner had found, but it found the employer guilty of certain other § 8 (a) (1) infractions and entered a limited cease-and-desist order. Although the picketing occurred contemporaneously with the § 8 (a) (1) and § 8 (a) (5) unfair labor practice proceeding, it was never an issue before the Board.

here. A state court injunction in no way interferes with the Board's admitted power to prevent unfair labor practices or to secure federal injunctions in those situations specifically identified by Congress. *Capital Service, Inc.* v. *NLRB,* 347 U. S. 501 (1954), amply protects the Board's power to enjoin state court proceedings where an unfair labor practice is in progress and the jurisdiction of a federal court might later be invoked, but no such Board adjudication was occurring here concerning the picketing. *Capital Service* is not controlling.

*Leiter Minerals, Inc.* v. *United States,* 352 U. S. 220 (1957), held that the restrictions of § 2283 do not apply to the Federal Government. The Board identifies itself with the United States and therefore asserts that § 2283 is inapplicable to it. I cannot agree. The juridical status of the Board is not perfectly congruent with that of the United States. For example, although it may file claims for back pay in bankruptcy proceedings, it does not enjoy the priority accorded to debts owing to the United States. *Nathanson* v. *NLRB,* 344 U. S. 25 (1952).[2] *Leiter Minerals* had nothing to do with the cir-

---

[2] In *Nathanson,* as here, the Board was attempting to protect the § 7 rights of private parties. If anything, the situation in *Nathanson* was a much stronger one for equating the status of the Board to that of the United States, since there the Board was seeking to enforce a back pay award (by filing a proof of claim against the employer, who had become a bankrupt, and asserting that its back pay order was entitled to the priority of a debt owing the United States under § 64 (a) (5) of the Bankruptcy Act, 11 U. S. C. § 104 (a) (5)) which it had assessed after adjudicating the employer guilty of a § 8 unfair labor practice. The Board was thus clearly discharging a designated statutory function, as distinguished from the instant case where the Board's jurisdiction to evaluate the disputed picketing in an unfair labor practice proceeding is totally unclear. The Court held, however, that "[i]t does not follow that because the Board is an agency of the United States, any debt owed it is a debt owing the United States" under the Bankruptcy Act, 344 U. S., at

cumstances in which an agency such as the NLRB should be treated as the United States; nor does that case purport to modify the rule of *Reconstruction Finance Corp.* v. *J. G. Menihan Corp.*, 312 U. S. 81, 85 (1941), that the intention of Congress to bestow the privileges and immunities of the United States on a federal agency must be clearly manifest.[3] The authority of the Federal Government to secure an injunction in *Leiter Minerals* was implied under the judicial rule that a statute that divests pre-existing rights or privileges will not be applied to the sovereign in the absence of explicit language. 352 U. S., at 224. In the instant case, however, we deal with a statutorily defined agency created after the passage of § 2283 and possessing certain specified injunctive powers. The Board can claim no residual sovereignty such as that which was held in *United States*

---

27, and it disallowed the asserted priority on the ground that the function of the precedence given the United States under the Bankruptcy Act was to insure the collection of claims that had accrued to the fisc. The majority's attempt to distinguish *Nathanson* is less than convincing.

[3] Both *Menihan* and the present case present the question of whether a Governmental agency is clothed with a particular attribute of sovereignty: in *Menihan,* an exemption from payment of costs after unsuccessful litigation under Fed. Rule Civ. Proc. 54 (d) which was afforded to "the United States, its officers, and agencies . . . to the extent permitted by law," in the present case, an implicit exemption from § 2283. The Court emphasized that because the doctrine of sovereign immunity gives the Government a privileged position, it has been "appropriately confined," 312 U. S., at 84, and noted that "the government does not become the conduit of its immunity in suits against its agents or instrumentalities merely because they do its work." *Ibid.,* quoting *Keifer & Keifer* v. *Reconstruction Finance Corp.*, 306 U. S. 381, 388 (1939). Since "there is no presumption that the agent is clothed with sovereign immunity," 312 U. S., at 85, the Court examined the statute establishing the RFC and concluded that there was no affirmative indication by Congress that it had meant to exempt the RFC from paying costs after it had lost a lawsuit.

v. *United Mine Workers,* 330 U. S. 258, 272–273 (1947),
to exempt the United States Government from the re-
strictions of the Norris-LaGuardia Act, and by a familiar
rule of statutory construction, the enumeration of its
injunctive powers should be held to preclude the existence
of other powers.[4]  In light of the congressional disin-
clination to authorize anything more than extremely lim-
ited interferences with state court proceedings by federal
courts, and in view of this Court's reluctance to approve
such interference by way of the equitable powers of
federal courts, *Younger* v. *Harris,* 401 U. S. 37, 43–45
(1971); *Atlantic Coast Line R. Co.* v. *Brotherhood of
Locomotive Engineers,* 398 U. S. 281, 286 (1970), im-
plicit exceptions from § 2283 are at best suspect.

Section 2283 clearly permits injunctions against state
court proceedings if "expressly authorized by Act of
Congress."  There is no claim here that the injunction
sought by the Board is expressly authorized by any stat-
ute.  Indeed, it is admitted that express authorization is
lacking, and we are asked to imply such power.  The
Court does so, but its holding ignores both the language
and the traditional interpretation of § 2283 and is in-
consistent with the regulatory scheme of the LMRA.

Section 8 of the National Labor Relations Act, as
amended by the Labor Management Relations Act, 1947,
specifies unfair labor practices by employers and unions.
Section 9 provides for Board determination of bargaining
units and employee representatives.  Section 10 specifies
the procedures to be employed in preventing unfair labor
practices prohibited by § 8.  Two aspects of § 10 are
critical here.  First, the Board is not granted unqualified
powers to enforce the Act.  The statute conditions Board

---

[4] This rule has been frequently recognized by the Court, *United
States* v. *De la Maza Arredondo,* 6 Pet. 691, 724 (1832); *Kendall*
v. *United States,* 107 U. S. 123, 125 (1883); *Neuberger* v. *Commis-
sioner of Internal Revenue,* 311 U. S. 83, 88 (1940).

action against unfair labor practices upon the filing of a charge; it may not act on its own motion. The requirement is jurisdictional. *Montgomery Ward & Co.* v. *NLRB,* 385 F. 2d 760, 763 (CA8 1967); *Texas Industries, Inc.* v. *NLRB,* 336 F. 2d 128, 132 (CA5 1964); *Int'l Union of Electrical, Radio & Machine Workers* v. *NLRB,* 110 U. S. App. D. C. 91, 94, 289 F. 2d 757, 760 (1960); *Consumers Power Co.* v. *NLRB,* 113 F. 2d 38, 41–43 (CA6 1940); *NLRB* v. *Hopwood Retinning Co.,* 98 F. 2d 97, 101 (CA2 1938); *NLRB* v. *National Licorice Co.,* 104 F. 2d 655, 658 (CA2 1939), modified on other grounds, 309 U. S. 350 (1940); *Douds* v. *Int'l Longshoremen's Assn.,* 147 F. Supp. 103, 108 (SDNY 1956), aff'd, 241 F. 2d 278 (CA2 1957). See also *National Licorice Co.* v. *NLRB,* 309 U. S. 350, 369 (1940). The Board has no roving, unqualified power to prevent unfair labor practices or to enforce the provisions of § 7 declaring that employees shall have the right to organize, bargain collectively, and otherwise engage in concerted activities. In the case before us, no unfair labor practice charge arising out of the union's picketing has been filed, either by the union or by the employer. Yet the Board appeared in a federal court seeking an injunction seemingly aimed at protecting employee rights guaranteed by § 7.

Second, after a charge has been filed and an unfair labor practice complaint has been issued the Act grants the Board the power to seek "appropriate temporary relief or restraining order" from the courts. § 10 (j). Further, § 10 (1) specifies in even greater detail the circumstances under which temporary injunctions may be secured when charges under §§ 8 (b)(4)(A), 8 (b) (4)(B), 8 (b)(4)(C), 8(e), or 8 (b)(7) have been filed with the Board. Sections 10 (e) and 10 (f) define the powers of the Board and the courts to issue injunctions in connection with enforcement of Board orders after unfair labor practices have been adjudicated

by the Board. Nowhere in the statute is there a provision authorizing the Board to seek injunctions prior to the filing of unfair labor practices or the issuance of a complaint. Nowhere is the Board authorized to use the injunctive power to enforce § 7 rights, except in connection with adjudicating unfair practices. Congress specified the powers of the Board with some care, particularly its powers to seek injunctions. Manifestly, Congress was aware of its longstanding policy against indiscriminate injunctions in labor disputes; for in § 10 (h) it exempted from the Norris-LaGuardia Act only those situations where the courts are "granting appropriate temporary relief or a restraining order, or making and entering a decree enforcing, modifying, and enforcing as so modified or setting aside in whole or in part an order of the Board, *as provided in this section . . . .*" (Emphasis added.) On the floor of the Senate, Senator Smith answered the contention that the passage of § 10 (l) would weaken the Norris-LaGuardia Act:

> "The only comment I can make on that statement is that we were very careful in this bill to protect the injunctive process as it is protected in the Norris-LaGuardia Act, except in exceptional cases where the Government has to step in. In national paralysis cases we permit the Attorney General to step in, and in the boycott and jurisdictional strike cases we permit the National Labor Relations Board to step in; *and there is no other approach to the courts for injunction except in those two situations.*" 93 Cong. Rec. 4283. (Emphasis added.)

In such a context, today's decision is improvident. As a statutory matter under the Labor Management Relations Act, the Board has no power to seek the injunction it now demands even absent the barriers established by § 2283. And under that section, it is error to clothe the

agency with the exception applicable to the United States. When an agency of the United States, rather than the United States itself, is plaintiff in an injunction action, the specific exceptions to § 2283 should be deemed controlling, particularly that exception directing inquiry to whether the injunction is "expressly authorized by Act of Congress." Here it is plain to me that the Board has no such power as it now claims to have, and I would affirm the judgment below.

## II

A few additional words are appropriate. Even if, contrary to my view, the Board has power to seek an injunction to prevent interference with § 7 rights absent an unfair labor practice charge, it should not be able to obtain equitable relief by the mere conclusory allegation that such rights are "arguably" protected under the LMRA. Although § 7 rights must be interpreted according to federal law, "Congress has not federalized the entire law of labor relations," *Motor Coach Employees* v. *Lockridge*, 403 U. S. 274, 309 (1971) (WHITE, J., dissenting), nor has it wholly displaced state and federal courts in the administration of federal labor policy.

The employer in this case was subjected to picketing that it thought illegal and unprotected. It sought and was granted a state court injunction over protests that state judicial power was pre-empted by federal law and the exclusive jurisdiction of the NLRB. Rather than allowing the union to appeal the injunction through the state court system, and to this Court if necessary, as the union would ordinarily have to do, *Atlantic Coast Line R. Co.* v. *Brotherhood of Locomotive Engineers,* *supra,* the Court today permits the Board to short-circuit that process by securing a federal injunction, solely upon allegations that the conduct of the union was arguably protected under federal law and was within the

exclusive jurisdiction of the NLRB. The Board does not, however, intimate what provisions of the LMRA the union was violating in picketing this employer. It does not assert the existence or imminence of an unfair labor practice by either side in connection with the picketing. It suggests no way in which the employer could secure an adjudication of whether the union's conduct was protected under federal law. It does not indicate what "superior federal interests" the state decree frustrated. Absent an unfair labor practice charge and complaint, the Board itself has no jurisdiction at all, let alone exclusive jurisdiction, to hold hearings and issue cease-and-desist orders to prevent interference with § 7 rights in situations like this.

Congress' swift overruling of the Court's decision in *Guss* v. *Utah Labor Relations Bd.,* 353 U. S. 1 (1957), by passage of NLRA § 14 (c), 73 Stat. 541, 29 U. S. C. § 164 (c), should make the Court approach with great caution the creation of another "vast no-man's land, subject to regulation by no agency or court." *Id.,* at 10. The NLRA was not enacted in a void and its strictures presuppose a certain degree of state authority and regulation:

> "A holding that the States were precluded from acting [to enforce their trespass laws against invasions of private property] would remove the backdrop of state law that provided the basis of congressional action but would leave intact the narrower restraint present in federal law through § 7 and would thereby artificially *create* a no-law area." *Taggart* v. *Weinacker's, Inc.,* 397 U. S. 223, 228 (1970) (BURGER, C. J., concurring) (emphasis in original).

The Board should not, therefore, be able to obtain an injunction by merely alleging that conduct is "argu-

ably protected" by the LMRA. This rationale for pre-empting the applicability of state law and the authority of state courts developed to protect the exclusive jurisdiction of the Board. *Int'l Longshoremen's Assn., Local 1416* v. *Ariadne Shipping Co.,* 397 U. S. 195, 201 (1970) (WHITE, J., concurring); *Taggart* v. *Weinacker's, Inc., supra,* at 227–228 (BURGER, C. J., concurring). Where the Board is itself not only unwilling but apparently powerless to move against the challenged conduct, this rationale is a species of federal overkill, pre-empting the field to protect nothing. Of course, federal law remains paramount in its own arena, but if the Board has power to enforce it in this situation, it should be required to prove its case before obtaining an injunction and should demonstrate that federal law has been violated and that equitable relief is necessary to prevent its frustration. An unwarranted and illogical lacuna in the legal regulation of labor-management relations should not be extended. The Board should not be entitled to an injunction against state court proceedings unless it persuades a federal court that the state decree is actually interfering with rights protected by federal law.

MR. JUSTICE BRENNAN would affirm the judgment of the Court of Appeals for the reasons stated in Part I of the dissenting opinion of MR. JUSTICE WHITE.