**COMMODITY FUTURES TRADING COMMISSION, Plaintiff-Appellee,**

v.

**CHILCOTT PORTFOLIO MANAGEMENT, INC.; Chilcott Commodities Corporation; Thomas D. Chilcott; and Thomas D. Chilcott, d/b/a Chilcott Futures Fund, Defendants,**

Shearson/American Express, Inc., Appellant in No. 82–2461, Boettcher & Company, Appellant in No. 82–2462, Platte View Bluffs Developments, Inc., Wayne E. Collins, II, Kim Collins, Kent Collins, Mark Collins, Tyson Collins, Sean Collins, Kirk Collins, Richard W. Nyman, Mildred E. Nyman, 7–C's Investments, Inc., and Ned E. Collins, Appellants in No. 82–2518, W.J. Forster, U. Forster, Acambaro Investment N.V., a Netherlands Antilles corporation, General Efficiency Establishment, a Principality of Liechtenstein corporation, Inwitax Ag, a Switzerland corporation, Midas Marketing & Investment Planning Ltd., a Cayman Islands corporation, Roger Wolf, Toni Stiffler, and C. Neven-Dumont, Appellants in No. 82–2460, and Elsie Baader, et al., Appellants in No. 82–2517, Appellants,

**James P. Johnson, Receiver for Chilcott Portfolio Management, Inc., Chilcott Commodities Corporation, and Chilcott Futures Fund, Appellee.**

Nos. 82–2460 to 82–2462, 82–2517 and 82–2518.

United States Court of Appeals, Tenth Circuit.

July 25, 1983.

Kenneth M. Raisler, Acting Gen. Counsel and Nancy E. Yanofsky, Atty., Washington, D.C., for Commodity Futures Trading Com'n, plaintiff-appellee (oral argument waived by counsel for the Com'n, submitting their position on the briefs).

Kenneth C. Groves, Denver, Colo. (Rodney R. Patula and Elaine A. Menter of Pryor, Carney & Johnson, Englewood, Colo., and Arthur E. March, Jr., of March, March, Myatt, Korb & Carroll, Fort Collins, Colo., of counsel, were on the brief), for James P. Johnson, as Equity Receiver for the Chilcott Futures Fund, appellee.

Stephen W. Myers of Wentworth & Ludin, Phoenix, Ariz. (Edwin S. Kahn of Kelly, Haglund, Garnsey & Kahn, Denver, Colo. and David S. Shughart, II, Phoenix, Ariz., were also on the brief), for appellants Elsie Baader, et al., in No. 82–2517.

Howard C. Buschman, III, of Willkie Farr & Gallagher, New York City (John R. Dutt of Willkie Farr & Gallagher, New York City, and Gorsuch, Kirgis, Campbell, Walker & Grover, John S. Pfeiffer, Robert E. Warren, Jr., S. Lee Terry, Jr., and Mark E. Haynes, of Denver, Colo., were also on the brief), for appellant Shearson/American Exp., Inc. in No. 82–2461.

David M. Ebel of Davis, Graham & Stubbs, Denver, Colo. (Glen E. Keller, Jr., Michael John Gallagher of Davis, Graham & Stubbs, Denver, Colo., and John S. Lutz, Denver, Colo., and Perry L. Taylor, Jr., of Katten, Muchin, Zavis, Pearl & Galler, Chicago, Ill., of counsel, were also on the brief), for appellant Boettcher & Co. in No. 82–2462.

Charles E. Matheson of Fairfield & Woods, Denver, Colo., on the brief for appellants W.J. Forster, et al. in No. 82–2460.

Charles F. Brega and Stuart N. Bennett of Roath & Brega, Denver, Colo., were on the brief, for appellants Platte View Bluffs Developments, Inc., et al. in No. 82–2518.

Before HOLLOWAY, BARRETT and DOYLE, Circuit Judges.

HOLLOWAY, Circuit Judge.

These consolidated appeals have been taken from an order entered by the District Court which stayed all proceedings in seven other suits in that court and, in addition, stayed one action in the District Court of Arizona and one in an Arizona state court. All of the cases arose from the allegedly fraudulent commodities investment activities of Thomas D. Chilcott. A general overview of the factual background and procedural history of the cases is necessary for an understanding of the issues on appeal. The facts are more thoroughly detailed in the order of Chief Judge Finesilver of August 30, 1982, in this cause, granting the Receiver's motion for the stay.

I

The facts as essentially stated in the District Court's order, are as follows: Thomas

D. Chilcott, individually and through various entities under his control (collectively referred to hereinafter as "Chilcott"), was engaged in commodities futures trading and was registered with the Commodities Futures Trading Commission ("CFTC") as both a commodities advisor and a commodities pool operator. An FBI investigation disclosed evidence that, from 1975 to 1981, Chilcott had attracted nearly $80 million in investments for a commodities pool from approximately 400 persons. The FBI estimated that in 1981 the commodities pool had only about $8 million in liquid assets, over one-half of which were held by Chilcott in his own name. The remainder was allegedly diverted by Chilcott into personal ventures or lost in speculative trading.

The CFTC and the FBI alleged that Chilcott had operated a "Ponzi" scheme. Reduced to the simplest terms, a "Ponzi" scheme attracts investors' monies by falsely reporting generous profits in past transactions and promising more lucrative results in the future. When losses are incurred instead of the predicted profits, the program must continue to attract more investments to keep afloat. The scheme includes paying attractive "profits" to some investors in order to sustain the appearance of success and increase the attractiveness of the plan to the unwary investors.

In 1981 the CFTC filed suit against Chilcott in the District Court of Colorado seeking preliminary and permanent injunctions and the appointment of an equity receiver pursuant to 7 U.S.C. § 13a–1 (hereinafter referred to as "the CFTC action"). The District Court granted the injunctions and appointed the appellee, James P. Johnson, as equity receiver. The Receiver was directed, *inter alia,* to take custody and control of all assets and records, to prevent further dissipation of assets, and to prosecute or defend all actions which he, with the court's approval, *might deem necessary to*

protect or recover assets of Chilcott. Furthermore, in the same order the court prohibited any person from interfering with the Receiver or with the court's jurisdiction over the Chilcott defendants. Thus the court effectively prevented any creditor or defrauded investor from seeking damages directly against Chilcott.

Subsequently Chilcott consented to a permanent injunction, an equitable accounting, and disgorgement of all profits derived from the fraudulent activities. The CFTC action has continued as one concerned with the administration of the receivership estate, with the eventual goal of distributing the recoverable assets to creditors and defrauded investors. Accordingly, the Receiver, with the court's approval, brought a separate, ancillary action against Thomas D. Chilcott individually and against several persons who allegedly dealt with Chilcott in soliciting investors and investing assets of the pool. The defendants included Boettcher & Company ("Boettcher") and Shearson/American Express, Inc. ("Shearson"), appellants, as well as three other individuals and "one or more John and/or Jane Does, and/or Doe Entities." (This ancillary action will hereinafter be referred to as "the Receiver's action.")[1]

On June 4, 1982, the same day that the Receiver's action was filed, the Receiver moved in the CFTC action for an order staying all other suits against the defendants in the Receiver's action. Before ruling on the motion the District Court permitted all parties who would be affected by the requested stay to appear specially to support or oppose the motion. All of the appellants appeared below and opposed the stay. The granting of this stay is the order from which this interlocutory appeal has been taken.

The stay expires by its terms on August 1, 1983, unless extended by the Court. The

---

1. The Receiver's action was assigned to Judge Carrigan, while Chief Judge Finesilver has at all times presided over the CFTC action.

Receiver has requested an extension.[2] The stay affected some eight cases filed in federal court; seven of these are in the District of Colorado, and one is in the District of Arizona. In addition, one action filed in state court in Arizona has been stayed. All of the federal cases apparently were filed in 1982, most of them before the Receiver's action was filed.[3] All of these cases were brought by groups of investors against brokerage firms and individual brokers, including appellants Shearson and Boettcher. So far as we can determine from the record, two individual investors whose actions were stayed have not appealed from the order. Plaintiffs in the other six federal cases have appealed, appearing before this court in three groups: the Baader plaintiffs, the Forster plaintiffs, and the Collins plaintiffs. The Baader group are the plaintiffs in both the state and federal cases in Arizona. (All of these lawsuits will be referred to at times as "the investors' actions.")

The investors' actions are based on the role of the intermediary brokers and their employees in the operation of Chilcott's allegedly fraudulent scheme and generally allege that the investors were induced to invest with Chilcott through misrepresentations. In contrast, the Receiver's action, although naming some of the same defendants, is based on the dissipation of the pool's assets rather than on any culpable conduct in soliciting the investments. This distinction is crucial to the disposition of this matter and requires some further explication.

While the Receiver's complaint averred actions by Chilcott inducing the investors to invest in the pool, the Receiver's position is that this was done merely to allege the entire Ponzi scheme, but that the allegations of fradulent inducement do not mean that damages on the claims for the inves-

tors are sought by the Receiver; rather the Receiver says the actual damages sought by the Receiver are damages to the Fund itself (the pool) as a result of actions of Chilcott. (Receiver's Brief at 37–38). Moreover, the District Court clearly based the order on its conclusion that the Receiver had authority to prosecute only claims of the pool, based on the handling of the monies after their investment. Slip Opinion at 7.

We turn now to the rulings made by the District Court in its stay order, which is appealed.

II

The District Court approached the motion for the stay by considering issues in two primary areas—first, the capacity and standing of the Receiver to bring the ancillary action, and second, the propriety of the requested stay.

In the first portion of its ruling, the District Court considered separately the issues of capacity, real party in interest, and standing. On standing, the court noted that whether the pool as a separate entity had suffered any compensable injury so that the Receiver would have standing to bring its claims was a question to be determined by the court in the Receiver's action. Chief Judge Finesilver accordingly declined to decide that question. Slip Opinion at 12 & n. 11. As to capacity and real party in interest, however, the court determined that these issues fundamentally concerned the "scope and nature of the receivership created in this [the CFTC] case," and so could be decided in ruling on the requested stay.

Most of the appellants direct vigorous objections to the court's resolution of the issues involved in the first area. One appel-

---

**2.** On June 21, 1983 the receiver filed a petition for an extension of the stay. On July 11 an objection thereto was filed by Boettcher and a memorandum in response was filed by Shearson. The Receiver filed a reply on July 15.

**3.** The stay order permitted additional suits to be filed and service of process to be perfected therein in order to avoid statute of limitations problems. The record does not disclose whether other suits in fact have been filed since the stay was entered.

**1482**

lant, Boettcher, argues that it was error for the District Court to consider these issues at all, and, alternatively, that the issues were wrongly decided. Boettcher maintains that Judge Finesilver should not have ruled on these issues because to do so created an appearance of conflict of interest, arising from the fact that Judge Finesilver is involved in administering the receivership. Boettcher further contends that deciding these issues encroached on Judge Carrigan's authority over the Receiver's action and at the same time denied Boettcher the due process rights to participate in the resolution of these issues before Judge Carrigan after having had discovery opportunities. The Receiver, on the other hand, argues that these issues are not appealable as of right. The Receiver concedes that this Court has discretion to consider the issues, but urges that we should decline to exercise this discretion because these were merely matters having to do with the administration of the receivership. Receiver's Brief at 17.

■ We are convinced that the District Court was correct in holding that the Receiver had the capacity to initiate the Receiver's action, and was the proper real party in interest to maintain that suit.[4] We agree with the court's reasoning that the Receiver comes within the provisions of Rule 17(b), F.R.Civ.P., in that the Fund is within the broad terms of an unincorporated association which may sue for the purpose of enforcing for itself substantive rights claimed under the Constitution or laws of the United States. The Receiver is asserting on behalf of the Fund substantive rights existing under Federal Law, the Securities Exchange Act, 15 U.S.C. § 78a *et seq,* and the Commodities Exchange Act, 7

U.S.C. § 1 *et seq.* The court properly conferred the power on the Receiver to sue. *See Jones v. Missouri-Edison Electric Co.,* 144 F. 765, 776–77 (8th Cir.1906); *Miller v. Steinbach,* 268 F.Supp. 255, 268–69 (S.D.N.Y.1967). Moreover the Commodities Exchange Act recognizes the status of commodity pool operators, 7 U.S.C. § 2, and the CFTC regulations recognize the status of a pool as "an entity cognizable as a legal entity separate from that of the pool operator." 17 CFR § 4.20(a)(1)(1982).

■ We are persuaded by the reasoning and authorities relied on by the District Court. Several appellants rely on *Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), as showing that the Receiver had no standing to assert what they say are third-party claims, but we feel that *Caplin* is distinguishable. It dealt with the right of a trustee under Chapter X of the Bankruptcy Act to assert, on behalf of debenture holders, claims of misconduct by an indenture trustee. The Court concluded that the trustee did not have standing to assert the claims. However, there were individual rights involved there existing under the debentures, running to the debenture holders. In the instant case the concern is with wrongs allegedly done to the Fund and the right of the Fund to recover is implicated. And in any event as the District Court noted, this discussion of *Caplin* leads into the question of standing. Standing involves both constitutional limitations and prudential principles. These questions require some consideration of the merits, and the District Court felt the standing question should be left to Judge Carrigan in the Receiver's action and other Judges presiding in other suits brought by the Receiver.

---

4. Boettcher's Reply Brief, at pp. 2–3, argues that Boettcher has a motion pending in the Receiver's action which "directly raises whether the 'fund' is a real bona fide entity with standing and capacity to assert its own damages, or whether it is only a subterfuge ...." We are holding only that on the pleadings and exhibits before him, Chief Judge Finesilver

properly held that the Receiver had the capacity to initiate the Receiver's action and was the proper real party in interest to do so. If evidence produced in that action before Judge Carrigan does not support the capacity and real party in interest rulings, they may be re-determined. As noted in the text, Judge Carrigan will also determine the standing question.

We agree and likewise do not treat the standing question.

■ In sum, we sustain the rulings of the District Court that, on the initial showing by the pleadings and exhibits, the Receiver had the capacity to bring the Receiver's action and was the proper real party in interest to bring that suit. We do not, however, reach or decide the standing question, with its special considerations, which was not decided by the District Court. That question will remain for consideration by Judge Carrigan in the Receiver's action and by other Judges presiding in other suits brought by the Receiver. As noted above, see note 4, in those actions brought by the Receiver, if evidence produced does not support the capacity to sue and the real party in interest rulings, they may be re-determined in those actions.

### III

#### A.

The second branch of the District Court's opinion concerned the propriety of the requested stay. The court first noted the inherent power of every court to control its docket and the balancing of competing interests necessarily involved in such matters. The court observed that in *Landis v. North American Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 165, 81 L.Ed. 153 (1936), the Supreme Court held that the power to grant a stay was not limited to the usual circumstances in which the same parties and issues are involved in separate actions in several courts. Slip Opinion at 13. The District Court further relied on the power of receivership courts to grant stays to prevent interference with the receivership estate. Although the cases supporting this principle generally have involved staying of litigation directly affecting the receivership property, the court held that the appropriate use of judicial authority in this area was not limited to these typical situations. Instead, it was said that the requested stay would be proper if the Receiver showed a "pressing need" therefor and if the affected parties would not "suffer undue harm." Slip Opinion at 14 (citing *Landis,* 299 U.S. at 255, 57 S.Ct. at 166). The court noted that a court of equity has the power, and in fact the duty, to "afford complete relief . . . consistent with the statutory language and policy, the legislative background and the public interest." Slip Opinion at 15 (quoting *Porter v. Warner Holding Co.,* 328 U.S. 395, 398 and 403, 66 S.Ct. 1086, 1089 and 1091, 90 L.Ed. 1332 (1946)).

The court gave the following reasons in concluding that the stay should be granted. First, the stay was found to be necessary to prevent interference with administration of the receivership estate. The likelihood that the investors' actions would generate discovery demands that would be burdensome to the Receiver was noted. This would interfere with the Receiver's attempts to verify claims and to bring litigation to recover assets, the court found. Second, by allowing the Receiver to litigate claims of the pool first, the stay would promote judicial economy and would likewise conserve the litigants' resources, narrowing and defining the issues and increasing settlement possibilities. Moreover, the court reasoned that adverse consequences might occur if the stay were not granted. The potential problems noted by the court were the impossibility of any investor being able to assess his damages before the Receiver had fully pursued actions on behalf of the pool, which might benefit the investors and the possibility that "an adverse judgment against a single investor may have collateral consequences against all other investors as well as the Receiver." Slip Opinion at 17.

Third, the court determined that the stay was in the best interest of all concerned—the investors, the defendants, and the public. The defendants would benefit from the opportunity to defend "the most damaging claims" against them in one action. The investors could be aided by the Receiver's action because of "collateral effects" and

because of the discovery that would have occurred. Finally, allowing the Receiver to maximize recovery for all investors would serve the public interest by promoting investor confidence in the commodities market, the court concluded.

### B.

In our study of the authorities cited by the court and in the briefs, we have found no cases in which similar relief has been afforded under comparable circumstances, nor has our own research disclosed any such precedent. That the appealed order is apparently unique in its context is not, of course, dispositive. The ruling on the stay involved an exercise of discretion, and we have focused first on the question whether the appellants have carried the weighty burden of showing an abuse of discretion. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953).

■ This motion called, *inter alia*, for balancing the competing interests on both sides. *See Dellinger v. Mitchell*, 442 F.2d 782, 786 (D.C.Cir.1971). In particular, where a movant seeks relief that would delay court proceedings by other litigants he must make a strong showing of necessity because the relief would severely affect the rights of others. Thus, even when the relief sought is only a stay of the case in which the motion is made,

> the suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else. Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both.

*Landis v. North American Co.*, 299 U.S. 248, 255, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936) (emphasis added).

The underlying principle clearly is that "[t]he right to proceed in court should not be denied except under the most extreme circumstances." *Klein v. Adams & Peck*, 436 F.2d 337, 339 (2d Cir.1971). Moreover, these precautions are of particular importance where, as here, restraints on other courts are contemplated:

> When an injunction sought in one federal proceeding would interfere with another federal proceeding, considerations of comity require more than the usual measure of restraint, and such injunctions should be granted only in the most unusual cases.

*Bergh v. Washington*, 535 F.2d 505, 507 (9th Cir.), *cert. denied*, 429 U.S. 921, 97 S.Ct. 318, 50 L.Ed.2d 288 (1976).

■ Thus, the movant for an order staying the prosecution of the nine investors' actions was required to make a strong showing that the remedy was necessary for the movant and that the disadvantageous effect on others would be clearly outweighed. We do not examine separately the staying of the state court action. Concerns of federalism, as expressed in the Anti-Injunction Act, 28 U.S.C. § 2283 (1976), with its origins in the early days of our republic, have caused the adoption of special restrictions where stays of state court proceedings are sought.[5] Because we conclude that the circumstances before the District Court do not support the stay of other federal actions granted, the stay of state proceedings likewise cannot stand.

### C.

■ In *Landis*, the Supreme Court rejected the argument that a court's authori-

---

5. We cite the Anti-Injunction Act only as an illustration of the vital policy considerations involved in staying a state court action. The Act may not be applicable in this case because of the status of the CFTC as a federal agency, *see NLRB v. Nash-Finch Co.*, 404 U.S. 138, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971), an issue that we do not reach. We do note that the underlying policy of preserving the independence of a state's judicial system must be carefully weighed in considering whether to stay a state court proceeding, even when the Act does not prohibit such restraint.

ty to stay proceedings before it in favor of proceedings in another court is limited to those instances when the parties and issues in the several cases are identical. 299 U.S. at 254–55, 57 S.Ct. at 166–67. The broad language of *Landis* was relied on, *inter alia,* by the District Court in its determination that it had the power to grant the stay of other suits sought here. Even assuming, *arguendo,* that a stay of this breadth may be within the equity powers of a court in appropriate circumstances, we must disagree with the District Court's conclusion that the Receiver made the clear case required of the applicant for such a stay of other suits.

As noted, the District Court relied essentially on three reasons in granting the stay. The first was the need to minimize interference with the administration of the receivership and the corresponding interest in protecting the Receiver from an anticipated deluge of discovery demands. Although the expectation that the investors' actions would generate a flood of discovery demands on the Receiver seems reasonable, the record does not show that there was in fact any undue burden on the Receiver when the stay was granted. More importantly, alternative measures could be used by the courts to cope with the discovery burden, when and if it became a pressing obstacle to administration of the receivership. We cannot agree that this protective concern justified the interference with all the investors' cases here. In the context of bankruptcy reorganizations, courts have held that mere convenience of administration is an insufficient basis for staying a cause before another court. *See, e.g., Thompson v. Texas Mexican Ry.,* 328 U.S. 134, 138–41, 66 S.Ct. 937, 941–42, 90 L.Ed. 1132 (1946); *Foust v. Munson S.S. Lines,* 299 U.S. 77, 57 S.Ct. 90, 81 L.Ed. 49 (1936); *Amadori Construction Co. v. Hoffenberg (In re Stanndco Developers, Inc.),* 534 F.2d 1050 (2d Cir.1976); *Feldman v. Trustees of Beck Industries, Inc. (In re Beck Industries, Inc.),* 479 F.2d 410 (2d Cir.), *cert. denied,* 414 U.S. 858, 94 S.Ct. 163, 38 L.Ed.2d 108 (1973); *Diner's Club, Inc. v. Bumb,* 421 F.2d 396 (9th Cir.1970).

The second justification cited was the consideration of judicial economy. We are persuaded, however, that such considerations should rarely if ever lead to such broad curtailment of the access to the courts. Clearly, the fact that the Receiver is asserting *only* claims of the pool means that the investors will eventually have to proceed with their individual actions if they are to recover at all on their claims of misrepresentations in the inducement to invest and for damages resulting therefrom. It is apparently undisputed between the parties in the cases before us that large losses by the pool resulted from diversions and speculation with its funds. It is only common sense to assume that the Receiver cannot be expected to recover one hundred per cent of the pool's diminished assets. Therefore, the investors' individual suits for recovery of damages for alleged misrepresentation by brokerage houses and their employees, inducing investments in the pool, will continue to be of vital importance to the individual investors. These suits are thus merely being delayed, but not obviated. Hence the conservation of judicial efforts by delaying the investors' suits will likely be negligible. Moreover we must agree with the appellants that other benefits cited—narrowing issues and increasing settlement possibilities—are not persuasive in view of the basic fact that the receiver is pursuing *only* pool claims, and not the claims of individual investors.

Also noted were the possible collateral effects of an unsuccessful investor action and the problem of how any individual investor could measure his damages in the investors' suits before disposition of the Receiver's suit. Although the application of collateral estoppel has been broadened in recent years by the abrogation of the requirement of mutuality of estoppel, *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), and the subsequent advent of "offensive" use of collateral estoppel, *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552

(1979), the underlying principle remains that due process requires the estoppel to be applied only against those litigants who have had a "full and fair opportunity" to contest the issue, *Parklane Hosiery,* 439 U.S. at 328, 99 S.Ct. at 650 (quoting *Blonder-Tongue,* 402 U.S. at 329, 91 S.Ct. at 1443). Accordingly, issue preclusion could apply only against parties or their privies. *Artrip v. Califano,* 569 F.2d 1298, 1300 (4th Cir.1978); *see Montana v. United States,* 440 U.S. 147, 153–55, 99 S.Ct. 970, 973–74, 59 L.Ed.2d 210 (1979); Restatement (Second) Judgments §§ 27–29, 41 (1982). A judgment on the merits in one investor action would have no collateral estoppel effect on any investor (or the Receiver) who was not a party to that action.[6] The difficulty of proving damages is, like the discovery problem, one that is amenable to handling by less disruptive measures; liability determinations, which involve some elderly investors, *see* note 8, *infra,* might proceed and any final damages determinations could be made after adjustment for any benefits received by individuals from the pool recovery. Furthermore, this consideration is not pertinent in some cases because the investors there seek rescission for fraudulent inducement; to the extent that this remedy is granted, there will be no need to gauge the losses of those investors' portions of the pool.[7]

The third basis for the District Court's ruling was the interests of the investors, the defendants, and the public. With respect to the investors and the defendants, we note that there was unanimous and vigorous opposition to the stay by those parties

in the District Court, as there is in these appeals. The investors persuasively emphasize their right to participate in discovery with counsel of their choice. Moreover the defendants in the Receiver's action do not include all of the defendants in the investors' actions. At best then, discovery in the Receiver's action can be expected to involve only some of the defendants in the investors' actions and perhaps some of the plaintiffs. The opportunity to depose the remaining parties is postponed, with possibly serious consequences.[8] We must agree with the investors that the adverse effects of the broad stay order on their individual suits demonstrate that the interests of the investors serve as no justification for the stay.

The concern for the public interest in promoting investor confidence in the commodities markets by allowing the Receiver to pursue his action is, of course, valid. We cannot agree, however, that there is any convincing showing that the Receiver's action is actually threatened by the prosecution of the investors' suits. We must agree with the investors that investor confidence is not likely to be promoted in view of the adverse effects of the denial of access to the courts on the investors' claims, which are distinct from those of the Receiver.

## IV

■ Accordingly, we affirm the ruling of the District Court that the Receiver had the capacity to commence his action on behalf of the Fund and the Court's ruling that the Receiver was the proper real party in

---

**6.** The District Court did not consider the possible collateral effects to be a threat to the jurisdiction of the court. Concern about res judicata effects from another action would not justify enjoining the prosecution of the investors' causes. *See, e.g., Carter v. Ogden Corp.,* 524 F.2d 74, 76 (5th Cir.1975).

**7.** The Baader plaintiffs also seek damages for emotional distress, *cf. Malandris v. Merrill Lynch, Pierce, Fenner & Smith,* 703 F.2d 1152 (10th Cir.1983); this cause of action is obviously different from the claims asserted in the Receiver's action.

**8.** After the stay order was entered, the Baader plaintiffs sought partial relief from the stay to

depose several elderly plaintiffs and one elderly defendant. III R. 514. By affidavit, counsel for the Baader plaintiffs showed the court that this group of plaintiffs included seven persons over seventy years of age and several other persons who had retired before age sixty-five due to serious medical problems, such as coronary bypass surgery, but were forced to return to work because of the loss of their investments in the Chilcott transactions. The motion was denied. IV R. 660. *Cf. Texaco, Inc. v. Borda,* 383 F.2d 607 (3d Cir.1967) (abuse of discretion to deny relief from stay order to allow deposition of elderly individual to be taken).

interest to do so, said rulings being subject to re-determination as provided in Part II. We must hold that in view of the lack of sufficient justification for the stay order enjoining the prosecution of the investors' actions, the grant of the stay was in error and an abuse of discretion, and the stay order is therefore reversed and the cause is remanded for further proceedings.

