**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
DECEMBER 16, 2021

*González C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
DECEMBER 16, 2021

*Erin Lennon*
ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| GLACIER NORTHWEST, INC., d/b/a CalPortland, | NO. 99319-0 |
| Respondent/Cross Petitioner, | EN BANC |
| v. | |
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL UNION NO. 174, | |
| Petitioner/Cross Respondent. | Filed: <u>December 16, 2021</u> |

STEPHENS, J.— This case asks us to decide whether an employer's state tort claims against its truck drivers' union are preempted by the National Labor Relations Act (NLRA)[1] and whether any claims that are not preempted were properly dismissed below. Glacier Northwest Inc.[2] claims the International Brotherhood of

---

[1] 29 U.S.C. §§ 151-169.
[2] Glacier does business as "CalPortland." Clerk's Papers at 1. We refer to the company as "Glacier," following the lead of the parties and the Court of Appeals.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Teamsters Local Union No. 174 (Local 174) is liable for concrete product loss during a strike and for an alleged misrepresentation by a union representative that Glacier claims interfered with its ability to service a concrete mat pour.  The trial court ruled the strike-related claims were preempted by the NLRA and granted summary judgment for Local 174 on the misrepresentation claims.  Glacier appealed, and the Court of Appeals reversed on the preemption issue but affirmed the trial court's dismissal of the misrepresentation claims.  We granted review and accepted amicus curiae briefing from the American Federation of Labor and Congress of Industrial Organizations.

Today we affirm in part and reverse in part, remanding this case to the trial court with instructions to dismiss Glacier's claims consistent with this opinion.  We conclude the NLRA preempts Glacier's tort claims related to the loss of its concrete product because that loss was incidental to a strike arguably protected by federal law.  We also affirm the dismissal of Glacier's misrepresentation claims because the union representative's promise of future action was not a statement of existing fact on which those claims can be properly based and because the statement was not a proximate cause of Glacier's losses.

FACTS AND PROCEDURAL HISTORY

Glacier is a Washington corporation that sells and delivers ready-mix concrete to businesses in Washington.  According to its complaint, Glacier creates custom

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

batches of concrete for each job, mixing various materials to customer specifications. The materials are first mixed in a hopper or a barrel, then moved into a ready-mix truck that continues to mix the materials until the concrete is delivered to the customer. Concrete begins to harden as soon as 20 to 30 minutes after the mixing stops, so Glacier must deliver the concrete on the same day it is mixed or else it becomes useless. And if the concrete remains in the ready-mix trucks long enough, it will eventually harden and damage the truck's revolving drum.

Glacier employs approximately 80 to 90 truck drivers to deliver concrete, and Local 174 is the exclusive union representative for Glacier's truck drivers in King County. Glacier's lawsuit stems from Local 174's conduct both before and after the ratification of a new collective bargaining agreement (CBA) between Glacier and Local 174 on August 18, 2017. On August 11, 2017, during negotiations for the new CBA, Glacier truck drivers went on strike by stopping work, and this strike resulted in the loss of some of Glacier's concrete. Just after the CBA was ratified and the strike ended on August 18, 2017, a Local 174 representative allegedly misrepresented whether Glacier drivers would service a job that was rescheduled to August 19 after the August 11 strike. We examine each claim in turn.

I. August 11, 2017: Work Stoppage and Concrete Loss

On August 11, 2017, Glacier had a number of scheduled deliveries. Around 7:00 a.m. that morning, drivers at Glacier's Seattle, Kenmore, and Snoqualmie

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

facilities engaged in what Glacier describes as a "sudden cessation of work." Clerk's Papers (CP) at 6. Glacier alleges this work stoppage occurred with truck drivers at every stage of the delivery process, including trucks waiting to be loaded, being initially loaded with concrete, driving en route to delivery sites, and already at sites delivering the concrete. A declaration of Adam Doyle, a dispatch coordinator, stated that drivers were scheduled to start work that day between 2:00 a.m. and 7:00 a.m. After learning of the strike, Doyle announced over the radio that "'I've just been informed to advise you that we are obligated to finish any job that we have started.'" CP at 208. Doyle further explained the normal process for drivers who return their trucks after making a concrete delivery, stating that the driver "offloads his leftover concrete into a reclaimer or into an ecology block form. He then rinses out his drum, and he gets back in line for his next load." CP at 208. But on that day, Doyle explained that drivers all brought their trucks back between 7:00 a.m. and 7:45 a.m., and he noted that many of the trucks were left with partial or full loads of concrete. Justin Denison, the ready-mix concrete manager for all facilities in Washington, was present at the Duwamish facility when the strike occurred. He stated that at least 16 drivers returned to the site with trucks fully loaded with concrete. While 7 of these drivers gave Glacier notice of the return of the trucks, 9 drivers left trucks without notice to Glacier.

Glacier alleges Local 174 had coordinated with truck drivers to purposely time the strike when concrete was being batched and delivered in order to cause destruction of the concrete. Glacier further alleges its drivers and Local 174 were fully aware that the concrete was perishable. As a result, Glacier had to take mitigation measures to dispose of the batched concrete on site through "constructed bunkers" and to clean out the trucks to prevent any damage to the trucks or to its plant, equipment, and wastewater system. CP at 8.[3] Glacier alleges the concrete was destroyed when it was left to harden, and Glacier had to hire trucks, break up the concrete, and haul it off-site. Glacier was unable to complete its deliveries that day. None of the trucks carrying the concrete were damaged because Glacier was able to take the concrete out of the trucks before it hardened.

---

[3] As the Court of Appeals noted, Denison elaborated on what the strike looked like at the Duwamish facility:

> I was present in the yard when the loaded trucks came rolling back in on August 11. . . . It was complete chaos. We had to offload the concrete from the barrels before it "set up." We had to dispose of the concrete in a timely manner to avoid costly damage to the mixer trucks and in a manner so as not to create an environmental disaster. We had to reorganize material storage bunkers into which we offloaded the concrete. We had to deal with settling ponds, treatment of material and filter presses to handle hundreds of cubic yards of concrete. It took us 5 hours to properly handle and clean-up the mess created by the drivers.

CP at 202-03.

Based on this conduct, Glacier wrote warning letters to 16 drivers, citing violation of Glacier's work and safety rules. However, Glacier withdrew the letters issued to 7 of the drivers who had given notice of their abandonment or who took steps to avoid damage to the trucks.

 II.    August 19, 2017: Mat Pour Cancellation

The second set of claims in Glacier's complaint involves a statement by Local 174 Secretary Treasurer Rick Hicks concerning the "Vulcan Project," a construction project in Seattle's South Lake Union for which GLY Construction Inc. was the general contractor. CP at 10. Glacier was scheduled to perform a mat pour at the Vulcan Project on August 12, 2017.[4] However, due to the strike on the morning of August 11, Glacier was forced to postpone the mat pour.[5] While Glacier rescheduled the mat pour for August 19, it did not schedule drivers for work that day because it was unclear how long the strike and bargaining for the new CBA would last.

---

[4] A mat pour involves delivery of a large amount of concrete to pour a concrete slab that acts as the foundation for a commercial building. Mat pours are a substantial undertaking. They require a significant labor force to batch the concrete, move it into ready-mix trucks, and deliver the concrete to the site. They further require personnel at the delivery location, including subcontractors to pump the concrete into the foundation and inspect the foundation, as well as police officers. Mat pours require a permit from the city of Seattle, and they usually take place on Saturday nights to minimize traffic disruption.

[5] Local 174 had initially considered a plan to strike on August 12. But after a conversation between Ted Herb and Rick Hicks, Local 174 decided to strike on August 11 instead to avoid unintentional harm to GLY.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

On August 18, Glacier and Local 174 agreed to the terms of the new CBA, which was ratified after a vote by the drivers at approximately 11:00 a.m. The new CBA was retroactive, encompassing the period of August 1, 2017 through July 31, 2021. As the result of the CBA ratification, the strike ended and Local 174 sent out a press release, appearing on Facebook and Local 174's website, stating that the strike was over and the drivers were back to work. In light of the ratification of the agreement, Glacier and GLY discussed scheduling the Vulcan Project mat pour early the next day, Saturday, August 19.

But there were rumors that drivers would not work on August 19. Because of these rumors, both Glacier and GLY wanted assurances from the union that the mat pour would be serviced if scheduled. At Glacier's request, Ted Herb, GLY president, called Hicks around 12:35 p.m. on August 18 to discuss whether the drivers would be available that night and early the next morning to service the mat pour. Herb alleged that Hicks told him that "'[t]he drivers have been instructed to respond to dispatch'" and that "'[w]e have specifically instructed the drivers to respond to dispatch.'" CP at 1648. After Herb told Glacier of Hicks's assurances, Glacier remained concerned about drivers servicing the mat pour, and it requested that Herb call Hicks again. Herb refused this request, as he was confident in Hicks's

*Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Local Union No. 174,* No. 99319-0

response because Hicks had given him the same answer twice. Glacier never spoke directly with Hicks, and Hicks denies making these statements.[6]

Glacier and GLY allege they reasonably relied on Hicks's statement that the drivers would service the mat pour to dispel the rumors that drivers were not working that night. Glacier and GLY decided to move forward with the mat pour. Apparently consistent with Glacier's past practice in calling drivers for weekend work, Glacier's dispatch team called drivers before 5:00 p.m. to tell them of their work assignments and that they would be in violation of their contract if they failed to report; Glacier left voice mail recordings for those who did not answer the phone. It also provided a "call-out recording" with start times. Just before the job was due to be serviced that night, however, Glacier found out that not enough drivers were reporting for the mat pour. While 40 to 50 drivers were needed to complete the job, only 22 reported. By 1:00 a.m., only 11 drivers were on-site ready to deliver concrete. Glacier was forced to cancel the mat pour at 1:15 a.m., and it incurred losses in labor costs and approximately $100,000 paid to GLY for the cancellation. Glacier issued disciplinary warning letters to the 39 drivers who were called but did not report,

---

[6] In Hicks's deposition, he denied providing any instructions to drivers about when to return to work and specifically denied telling Herb that he had told drivers to report to work on Saturday, August 19. A driver testified that Hicks told the members to go back to work on Monday, August 21. For purposes of summary judgment, we view the facts in the light most favorable to Glacier as the nonmoving party and thus accept as true that Hicks made the alleged statements.

8

citing failure to service the mat pour and thereby "engaging or participating in any interruption of work or production." *See, e.g.*, CP at 1696. Glacier was able to reschedule the mat pour, which was completed the next week.

III.     Procedural History

On December 4, 2017, Glacier filed a complaint for damages in King County Superior Court against Local 174, alleging six claims. Based on the work stoppage on August 11, Glacier sued Local 174 for conversion and trespass to chattels, tortious interference with contract, and civil conspiracy to destroy its concrete. Glacier also sued Local 174 for negligent misrepresentation, fraudulent misrepresentation, and intentional interference with contract based on Hicks's statements to Herb.

Soon after, Local 174 filed a complaint with the National Labor Relations Board (Board), alleging Glacier committed unfair labor practices under 29 U.S.C. § 158(a)(1) and (3) by retaliating against Local 174 members for engaging in a protected strike; threatening to file, and then filing, an "objectively baseless federally preempted lawsuit"; and abusing the discovery process to obtain information about protected activity. CP at 136.

Local 174 moved to dismiss all of Glacier's tort claims for lack of subject matter jurisdiction and failure to state a claim on which relief could be granted, arguing the claims were all preempted by 29 U.S.C. §§ 157, 158 (sections 7 and 8).

9

The trial court agreed with Local 174 as to the three claims arising from the events on August 11, concluding that while those claims involved some economic harm when the concrete was destroyed, the drivers' conduct did not "touch[] an interest so deeply rooted in local feeling and responsibility, such as vandalism or violence, that it clearly falls outside the protection of [the] NLRA." 2 Verbatim Report of Proceedings (VRP) (Apr. 19, 2018) at 79-80. But the court refused to dismiss the remaining claims arising from the August 19 events because they involved conduct occurring after the ratification of the CBA on August 18, and were therefore not subject to the protections and prohibitions federal law provides during the collective bargaining period.

In light of the trial court's ruling on the motion to dismiss, Local 174 moved for summary judgment on the claims arising from the August 19 events. The trial court granted summary judgment dismissal of those claims primarily on state law grounds. First, as to the merits of the misrepresentation claims, the trial court ruled that the undisputed facts showed Glacier could not have reasonably relied on Hicks's statements about drivers responding to dispatch; the drivers were not required to respond to dispatch under the terms of the CBA because Glacier had not provided the requisite notice nor had it complied with seniority requirements. For the intentional interference with contract claim, the trial court concluded Hicks's statement was not intended to breach or terminate Glacier's contract with GLY, and

10

*Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Local Union No. 174,* No. 99319-0

the statement did not proximately cause interference because the drivers were not obligated under the CBA to service the mat pour. As an alternative basis for dismissal, the trial court ruled that these claims were preempted by section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a), because the trial court would have to interpret the CBA in analyzing the three claims.

Glacier appealed, and the Court of Appeals reversed the dismissal of the destruction of property claims but affirmed the dismissal of the misrepresentation claims. *Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Local Union No. 174*, 15 Wn. App. 2d 393, 475 P.3d 1025 (2020). The Court of Appeals recognized the applicable preemption standard from the leading case, *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 246, 79 S. Ct. 773, 3 L. Ed. 2d 775 (1959). The court concluded that while the state claims involving conduct arguably protected by the NLRA are preempted, there was a "'clear determination'" from the United States Supreme Court and the Board that the destruction of concrete was unprotected conduct under section 7. *Glacier*, 15 Wn. App. 2d at 408 (quoting *Garmon,* 359 U.S. at 246). The Court of Appeals therefore reversed the trial court and concluded the claims arising from events on August 11, 2017 were not preempted.

Next, the Court of Appeals affirmed the summary judgment dismissal of the three claims arising out of Hicks's alleged misrepresentation. The Court of Appeals disagreed with the trial court's alternative ruling that these tort claims were

11

preempted by section 301 of the LMRA, holding the claims did not necessarily require analysis of the CBA. *Id.* at 412-14 (citing *Commodore v. Univ. Mech. Contractors, Inc.*, 120 Wn.2d 120, 126, 839 P.2d 314 (1992)). Nonetheless, the court affirmed summary judgment dismissal on the merits of each of these claims on state law grounds, though its reasoning differed from the trial court's ruling.

The Court of Appeals first analyzed Hicks's statement, which it recited as "'the drivers will respond to dispatch.'" *Id.* at 414. It concluded this was a promise of future performance, which is not actionable for a fraudulent or negligent misrepresentation claim. *Id.* (citing *Adams v. King County*, 164 Wn.2d 640, 662, 192 P.3d 891 (2008)). Because both claims require a statement of existing fact, the Court of Appeals affirmed summary judgment dismissal without reaching the issues of reasonable reliance or proximate cause, as the trial court had.

The Court of Appeals also affirmed the summary judgment dismissal of Glacier's intentional interference with contract claim. The Court of Appeals noted that Glacier did not have to prove a breach or termination of contract as a result of the misrepresentation because Washington cases recognize a section of the *Restatement (Second) of Torts* allowing recovery for tortious interference that causes a performance to be more expensive or burdensome. *Id.* at 415 (citing RESTATEMENT (SECOND) TORTS § 766A (AM. LAW INST. 1979)). But it nonetheless concluded that factual causation was not met as a matter of law

*Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Local Union No. 174,* No. 99319-0

because the undisputed terms of the CBA showed Glacier had not complied with the notice requirements for weekend work or the listed seniority requirements. *Id.* at 416-17. As a result, Glacier drivers had no obligation to service the mat pour when called by dispatch. The Court of Appeals concluded that "[e]ven had Hicks instructed the drivers to show up to work that night, Glacier has no evidence the drivers had any duty to comply with such an instruction." *Id.* at 417.

Local 174 petitioned for discretionary review in this court, seeking review of the Court of Appeals holding that Glacier's claims were not preempted by the NLRA. In its answer to Local 174's petition for review, Glacier cross petitioned for review of the Court of Appeals holding affirming the summary judgment dismissal of Glacier's misrepresentation claims and intentional interference with contract claim. We granted review of both Local 174's petition for review and Glacier's cross petition for review. *Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Local Union No. 174*, 197 Wn.2d 1001 (2021).

## ANALYSIS

I.    Glacier's strike-based claims are preempted because the conduct at issue is at least "arguably protected" by section 7 of the NLRA

The trial court dismissed Glacier's three claims based on the August 11 work stoppage for lack of subject matter jurisdiction under CR 12(b)(1) and for failure to state a claim under CR 12(b)(6). This court reviews whether a state court has subject

13

matter jurisdiction de novo. *Dougherty v. Dep't of Labor & Indus.*, 150 Wn.2d 310, 314, 76 P.3d 1183 (2003). A court may grant a motion to dismiss for the failure to state a claim under CR 12(b)(6) when "'the plaintiff can prove no set of facts, consistent with the complaint, which entitle the plaintiff to relief.'" *Orwick v. City of Seattle*, 103 Wn.2d 249, 254, 692 P.2d 793 (1984) (quoting *Corrigal v. Ball & Dodd Funeral Home, Inc.*, 89 Wn.2d 959, 961, 577 P.2d 580 (1978)). We accept the factual allegations in the complaint as true, but we need not accept any legal conclusions stated in the complaint. *Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 121, 744 P.2d 1032 (1987).[7]

A. *Garmon* holds that state law claims are preempted when they involve conduct "arguably" protected under section 7

Congress has the power to preempt state law based on the supremacy clause of the United States Constitution. U.S. CONST. art. VI, cl. 2. In preemption cases involving federal labor law, we have noted "our general prejudice against

---

[7] As the Court of Appeals recognized, both Local 174 and Glacier submitted evidence relating to Local 174's separate complaint to the Board. "While the submission and consolidation of extraneous materials by either party normally converts a CR 12(b)(6) motion to one for summary judgment, if the court can say that no matter what facts are proven within the context of the claim, the plaintiffs would not be entitled to relief, the motion remains one under CR 12(b)(6)." *Haberman*, 109 Wn.2d at 121. We may consider hypothetical facts supporting the complaint. *Kinney v. Cook,* 159 Wn.2d 837, 842, 154 P.3d 206 (2007). Because we dismiss the property destruction claims as preempted as a matter of law, Local 174's motion to dismiss under CR 12(b)(6) is not converted into a summary judgment motion.

*Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Local Union No. 174,* No. 99319-0

preemption. Federal preemption can often produce a harsh result, and we are hesitant to find no state jurisdiction absent clear congressional intent." *Hume v. Am. Disposal Co.*, 124 Wn.2d 656, 664, 880 P.2d 988 (1994). Nonetheless, we have recognized that federal labor legislation may preempt state law, and the United States Supreme Court has established theories of preemption when the federal legislation does not define the precise contours of when state law is preempted. *Beaman v. Yakima Valley Disposal, Inc.,* 116 Wn.2d 697, 702-03, 807 P.2d 849 (1991).

Because Local 174 characterizes the work stoppage by truck drivers as a strike, the preemption theory of Glacier's property destruction claims asserted by Local 174 in this case derives from *Garmon,* 359 U.S. 236. *Garmon* concerns preemption based on sections 7 and 8 of the NLRA, protecting concerted activities in collective bargaining and prohibiting unfair labor practices respectively. 29 U.S.C. §§ 157 ("Employees shall have the right to . . . engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."), 158(a)(1) ("It shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title.").[8] "Collective bargaining, with the right to strike at its

---

[8] The Supreme Court has recognized two other types of preemption under federal labor law that are potentially implicated in this case. First, state claims are preempted when they

15

*Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Local Union No. 174,* No. 99319-0

core, is the essence of the federal scheme." *Div. 1287, Amalg. Ass'n of St., Elec. Ry. & Motor Coach Emps. v. Missouri.*, 374 U.S. 74, 82, 83 S. Ct. 1657, 10 L. Ed. 2d 763 (1963). And a walkout generally is a type of strike possibly protected by section 7. *E. Chi. Rehab. Ctr., Inc. v. Nat'l Labor Relations Bd.*, 710 F.2d 397, 402-03 (7th Cir. 1983); *see also Bob Evans Farms, Inc. v. Nat'l Labor Relations Bd.*, 163 F.3d 1012, 1023 (7th Cir. 1998).

The Court's recognition of preemption of state claims for damages based on sections 7 and 8 stems from the need to avoid even the potential risk of interference with the development of national labor policy under the expertise of the Board. *Garmon,* 359 U.S. at 243-44. In *Garmon*, the Supreme Court considered whether sections 7 and 8 preempted an employer's state law claim for injunction and damages resulting from a union picketing the employer's place of business. *Id.* at 237-38. The state court had awarded damages, but no injunction, based on unfair labor practices under state tort law. *Id.* at 239. The Court noted that its role in deciding whether a state law claim is preempted is to limit the "potential conflict" between differing results of the Board and state courts in recognition that "Congress has

---

involve conduct occurring during labor disputes that Congress intended to be left unregulated and "'to be controlled by the free play of economic forces.'" *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp't Relations Comm'n*, 427 U.S. 132, 140, 96 S. Ct. 2548, 49 L. Ed. 2d 396 (1976) (quoting *Nat'l Labor Relations Bd. v. Nash-Finch Co.*, 404 U.S. 138, 144, 92 S. Ct. 373, 30 L. Ed. 2d 328 (1971)). Second, Section 301 of the LMRA, 29 U.S.C. § 185(a), provides federal courts with exclusive jurisdiction over lawsuits involving the violation of collective bargaining agreements.

entrusted administration of the labor policy for the Nation to a centralized administrative agency, armed with its own procedures, and equipped with its specialized knowledge and cumulative experience." *Id.* at 242.

Respecting the expertise of the Board in interpreting national labor law, the Court highlighted that courts are not the proper forum for deciding whether particular conduct is subject to section 7 or section 8 in the first instance. *Id.* at 244-45. The Court therefore ruled that "[w]hen an activity is *arguably subject to* [*section*] *7 or* [*section*] *8 of the Act*, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." *Id.* at 245 (emphasis added). Because the state lawsuit alleged that the union's picketing was an unfair labor practice, and because that conduct was at least arguably prohibited under section 8, the Court held that the state lawsuit was preempted by federal law. *Id.* at 246. And the Court noted it was irrelevant that the Board had declined to exercise jurisdiction over the case; as long as there was not a "clear determination" from the Board that the conduct was protected by section 7 or prohibited by section 8, a state lawsuit is preempted to avoid any state adjudication of conduct that would potentially conflict with the development of federal labor law. *Id.* The Court further highlighted that the Board's ability to grant only injunctive relief—rather than damages—was irrelevant and, indeed, possibly weighed in favor of preemption: "since remedies

form an ingredient of any integrated scheme of regulation, to allow the State to grant a remedy here which has been withheld from the National Labor Relations Board only accentuates the danger of conflict." *Id.* at 247.

Pursuant to the principles announced in *Garmon*, labor conduct is "arguably protected" under section 7 when the party asserting preemption "advance[s] an interpretation of the Act that is not plainly contrary to its language and that has not been 'authoritatively rejected' by the courts or the Board." *Int'l Longshoremen's Ass'n v. Davis*, 476 U.S. 380, 395, 106 S. Ct. 1904, 90 L. Ed. 2d 389 (1986) (quoting *Marine Eng'rs Beneficial Ass'n v. Interlake S.S. Co.,* 370 U.S. 173, 184, 82 S. Ct. 1237, 1243, 8 L. Ed. 2d 418 (1962)). Following *Garmon*, this court has stated the preemption standard in terms of whether the activity is "'potentially subject to federal regulation.'" *Beaman*, 116 Wn.2d at 704 (quoting *Garmon*, 359 U.S. at 246). Regardless of the precise formulation, the principle animating *Garmon* preemption is the avoidance of potential conflict with the Board's development of federal labor law.

B. The Court of Appeals erred by characterizing the conduct here as unprotected intentional destruction of property subject to the "local feeling" exception to preemption

*Garmon* preemption is not absolute. The Supreme Court recognizes two exceptions to its preemption analysis: (1) where "the activity regulated was a merely

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

peripheral concern of the Labor Management Relations Act" or (2) "where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." *Garmon*, 359 U.S at 243-44. The second exception is potentially at issue here.

The "local feeling" exception involves state jurisdiction over claims to "grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order." *Id.* at 247. This exception recognizes that "the compelling state interest, in the scheme of our federalism, in the maintenance of domestic peace is not overridden in the absence of clearly expressed congressional direction." *Id.* (citing *Int'l Union, United Auto., Aircraft & Agric. Implement Workers v. Russell*, 356 U.S. 634, 78 S. Ct. 932, 2 L. Ed. 2d 1030 (1958); *Youngdahl v. Rainfair, Inc.*, 355 U.S. 131, 78 S. Ct. 206, 2 L. Ed. 2d 151 (1957); *United Auto., Aircraft & Agric. Implement Workers v. Wis. Emp't Relations Bd.*, 351 U.S. 266, 274, 76 S. Ct. 794, 100 L. Ed. 1162 (1956); *United Constr. Workers v. Laburnum Constr. Corp.*, 347 U.S. 656, 74 S. Ct. 833, 98 L. Ed. 1025 (1954)).

The Supreme Court has observed that the focus of this exception is on whether the conduct involved "'intimidation and threats of violence.'" *Id.* at 248 (quoting *Russell*, 356 U.S. at 640). In a footnote in *Garmon*, the Court further elaborated on

19

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

the type of intimidating or violent conduct warranting a preemption exception. *Id.* at 248 n.6. While it did approvingly cite a case that briefly mentioned destruction of property as warranting state jurisdiction, *Wis. Emp't Relations Bd.,* 351 U.S. at 274 (noting "[t]he dominant interest of the State in preventing violence and property damage cannot be questioned"), the Court framed the state interest as applying to conduct involving some sort of violence or danger that undermines public order. *Garmon*, 359 U.S. at 248 n.6 (describing the conduct in *Laburnum*, 347 U.S. at 666-68, as "violent conduct" and "involving violence or threats of violence" and noting that the Court had limited damages to the "the violent nature of the conduct" of mass picketing in *Russell*, 356 U.S. at 638-42).

The Court has further described this exception to *Garmon* preemption as creating a category of conduct that is not protected under section 7: "The Court has held that state jurisdiction to enforce its laws prohibiting violence, defamation, the intentional infliction of emotional distress, or obstruction of access to property is not pre-empted by the NLRA. But none of those violations of state law involves protected conduct." *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 204, 98 S. Ct. 1745, 56 L. Ed. 2d 209 (1978) (footnotes omitted). If the work stoppage in this case fits within this category of unprotected conduct, then it is clearly not preempted and the state law claims may go forward.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The Court of Appeals concluded that intentional destruction of property was within the category of unprotected conduct covered by the "local feeling" exception in *Garmon*. *See Glacier*, 15 Wn. App. 2d at 408 (citing *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp't Relations Comm'n*, 427 U.S. 132, 136, 96 S. Ct. 2548, 49 L. Ed. 2d 396 (1976)). Glacier argues this is the proper analysis based on the United States Supreme Court's description of the type of claims states may exercise jurisdiction over. It is correct that the United States Supreme Court and some Washington Court of Appeals cases have included the destruction of property in describing matters over which states may exercise jurisdiction. *Lodge 76*, 427 U.S. at 136 ("Policing of actual or threatened violence to persons or destruction of property has been held most clearly a matter for the States."); *Nat'l Labor Relations Bd. v. Fansteel Metallurgical Corp.*, 306 U.S. 240, 253, 59 S. Ct. 490, 83 L. Ed. 627 (1939) ("The employees had the right to strike but they had no license to commit acts of violence or to seize their employer's plant. . . . But in its legal aspect the ousting of the owner from lawful possession is not essentially different from an assault upon the officers of an employing company, or the seizure and conversion of its goods, or the despoiling of its property . . . ."); *Wal-Mart Stores, Inc. v. United Food & Commercial Workers Int'l Union*, 190 Wn. App. 14, 26, 354 P.3d 31 (2015) (stating that "property damage" could possibly have provided a basis for the "local feeling" exception).

21

But *Garmon*'s reference to destruction of property was articulated primarily in terms of the violence of the labor conduct, which in turn implicated the State's interest in the domestic peace. 359 U.S. at 248 n.6. The Supreme Court has also allowed state claims to proceed for conduct that is considered "outrageous." *Farmer v. United Bhd. of Carpenters & Joiners, Local 25*, 430 U.S. 290, 301, 97 S. Ct. 1056, 51 L. Ed. 2d 338 (1977) (intentional infliction of emotional distress claim not preempted when based on outrageous conduct, threats, and intimidation); *see also Linn v. United Plant Guard Workers, Local 114*, 383 U.S. 53, 61-62, 86 S. Ct. 657, 15 L. Ed. 2d 582 (1966) (malicious libel). Properly understood, the "local feeling" exception links the State's interest in awarding damages for conduct arguably covered by the NLRA to violent or outrageous conduct. *Garmon*, 359 U.S. at 248 n.6 (emphasizing that in *Laburnum* "there is nothing in the measure of damages to indicate that state power was exerted to compensate for anything more than the direct consequences of the violent conduct").

If Glacier's claim could be characterized as based solely on the intentional destruction of property, the drivers' conduct may be the sort of tortious conduct marked by violence or outrageousness that invokes the State's interest in the maintenance of the public peace and that is categorically unprotected under the NLRA. *See Moore v. Gen. Motors Corp.,* 739 F.2d 311, 316 (8th Cir. 1984) (concluding that the "local feeling" exception did not apply to claims of fraud and

22

misrepresentation because the complaint did "not involve outrageous or violent conduct").

This claim would be stronger if Glacier's trucks or facilities had been intentionally destroyed. But the incidental destruction of products during a strike, as opposed to property damage for its own sake, has not been sufficient to invoke the "local feeling" exception in any United States Supreme Court case. If viewed as product damage incidental to the strike, the drivers' conduct is closely tethered to the exercise of their section 7 rights and, at the same time, is attenuated from the State's general interest in regulating violent conduct, such as vandalism, which is the core concern of the "local feeling" exception. While the complaint alleges that the drivers "willfully and intentionally interfered" with Glacier's right to property by returning concrete trucks with perishable product inside, the description of this conduct as willful and intentional is not controlling of the preemption question. CP at 14. Even though we must accept the facts stated in the complaint as true, *Garmon* emphasizes that the "'type of conduct'" involved is what determines the preemption analysis. 359 U.S. at 247-48; *see also Amalg. Ass'n of St., Elec. Ry. & Motor Coach Emps. v. Lockridge,* 403 U.S. 274, 292, 91 S. Ct. 1909, 29 L. Ed. 2d 473 (1971) ("It is the conduct being regulated, not the formal description of governing legal standards, that is the proper focus of concern."). The description of conduct as "intentional" does not equate to violent or outrageous conduct that is contemplated

23

by the "local feeling" exception. Moreover, the concrete product damage caused by the drivers' conduct cannot be viewed in isolation; viewed in the context of the strike, it does not clearly come within "local feeling" exception, so it is not clearly or categorically unprotected conduct under section 7 of the NLRA.

We disagree with the Court of Appeals that the conduct here is clearly and categorically unprotected. The appeals court's discussion of when intentional destruction of property invokes the "local feeling" exception is too expansive, and we must look further to Board precedent to assess whether the protected nature of the work stoppage and resulting concrete destruction has been "'authoritatively rejected' by the courts or the Board." *Int'l Longshoremen's Ass'n*, 476 U.S. at 395 (quoting *Marine Eng'rs,* 370 U.S. at 184). As will be discussed, if the conduct surrounding the work stoppage is arguably protected under the NLRA then the Act preempts Glacier's state law claims.

C. The work stoppage is arguably protected under section 7 because it involves two competing principles recognized in Board precedent

The Court of Appeals misread Board precedent in concluding the drivers' conduct was clearly unprotected under section 7. Specifically, the court improperly "harmonized" two competing principles recognized in the cases: (1) employees must take reasonable precautions to protect an employer's plant, property, and products and (2) economic harm may be inflicted through a strike as a legitimate bargaining

24

tactic. Because it is unclear where the strike in this case falls on the spectrum between these two principles, the strike is, at least, arguably protected conduct under section 7.

In analyzing preemption of Glacier's conversion and trespass to chattels claims, the Court of Appeals correctly noted that under Board precedent, "employees [must] take reasonable precautions to protect the employer's plant, equipment, or products from foreseeable imminent danger due to sudden cessation of work." *Bethany Med. Ctr.*, 328 N.L.R.B. 1094, 1094 (1999). In *Marshall Car Wheel*, for example, the Board considered whether an employer's discharge of employees violated 29 U.S.C. § 158(a)(1), (3) for firing employees as a result of protected strike activity. *Marshall Car Wheel & Foundry Co.*, 107 N.L.R.B. 314, 315. In that case, the employer used a cupola furnace to melt metals to make car wheels, pipe, and other products. *Id.* About half of the employees walked out on a strike during a time when the cupola was particularly active. While there was no damage to the property, the Board concluded that the strike was unprotected because the employees failed to take reasonable precautions to protect the plant from imminent danger resulting from the cupola being unattended at a busy time. *Id.*

The other competing principle involved here is that employees are allowed to cause some economic harm to effectuate a strike and gain leverage in bargaining. *Johnnie Johnson Tire Co.*, 271 N.L.R.B. 293, 294-95 (1984); *see also Falls*

25

*Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Local Union No. 174,* No. 99319-0

*Stamping & Welding Co. v. Int'l Union, United Auto. Workers, Aerospace & Agric. Implement Workers of Am., Region II*, 744 F.2d 521 (6th Cir. 1984) ("Federal labor law clearly permits employees to inflict economic harm on an employer for purposes of collective bargaining.").  In the context of a work stoppage, the Board stated in *Johnnie Johnson* that "[t]he effect of such a work stoppage on production is incidental and does not preclude protection of the Act so long as the employees involved take reasonable precautions to avoid eminent danger to the employer's physical plant which foreseeably would result from the work stoppage."  271 N.L.R.B. at 295.  Moreover, the Board has confirmed that the possible loss of perishable product from a work stoppage does not render the strike unprotected as long as the strike is done for bargaining purposes.  *Lumbee Farms Coop., Inc*. 285 N.L.R.B. 497, 503, 506-07 (1987); *Leprino Cheese Co*., 170 N.L.R.B. 601, 606-07 (1968) (diminution in the quality of cheese as a result of walkout did not render strike unprotected); *Cent. Okla. Milk Producers Ass'n*, 125 N.L.R.B. 419, 435 (1959) ("No unusual circumstance, such as aggravated injury to personnel or premises, was created by the fact that the milk handled is perishable and loss might be sustained; loss is not uncommon when a strike occurs." (footnote omitted)).

Glacier attempts to distinguish these cases because none of them involved actual or proven product loss.  Instead, it points to the Board decision the Court of Appeals relied on and quoted from at length in its application of these principles.

*Boghosian Raisin Packing Co*., 342 N.L.R.B. 383 (2004). According to the Court of Appeals, in *Boghosian*, the Board ruled that an employee work stoppage was unprotected because the employees failed to take reasonable precautions to protect a product from spoiling in order to intentionally damage that product. *Id.* at 396-97. The Court of Appeals reasoned that Glacier's allegations similarly involved unprotected conduct because the drivers allegedly failed to take reasonable precautions to protect the equipment, plant, or batched concrete and intentionally stopped work at a time when the concrete was being loaded. *Glacier,* 15 Wn. App. 2d at 411.

In *Boghosian*, the Board reviewed an administrative law judge's (ALJ) decision that an employer violated section 8 of the NLRA by not reinstating employees who went on strike and by withdrawing its recognition of the union as a collective bargaining representative. 342 N.L.R.B. at 384. The employer owned a raisin plant, and it fired certain employees after a work stoppage resulted in the spoilage of some of the employer's raisins. *Id*. The ALJ stated that in addition to the employees losing protected status under section 8(d), the strike was unprotected—and the employer therefore could take adverse action against the striking employees—because the employees failed to take reasonable precautions to protect the raisins and "deliberately time[d] their strike to cause product damage." *Id.* at 397. However, given the ALJ's initial conclusion that the employees had lost

27

*Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Local Union No. 174,* No. 99319-0

protected status for failure to comply with other parts of section 8(d), the ALJ noted that this finding was not "critical to this decision." *Id.* at 396. On review, the Board agreed that no violation occurred because the strikers lost their protected status under section 8(d). *Id.* at 385. As a result, the Board found it "unnecessary to pass on the judge's alternative finding that the discharge of the strikers was lawful because they had intentionally walked out in the middle of their shift in order to damage the Respondent's product." *Id.* at 387 n. 13. The analysis quoted by the Court of Appeals is dicta from the ALJ that was also not adopted by the Board; it is therefore of limited value and not persuasive here. More persuasive are the other Board decisions holding that incidental product damage does not render a strike unprotected.

Glacier points to one federal Court of Appeals case and one Illinois state case to argue that abandonment of concrete during a strike is unprotected. Resp't/Cross-Pet'r Glacier's Suppl. Br. at 5 (citing *Nat'l Labor Relations Bd. v. Marsden*, 701 F.2d 238, 242 n.4 (2d Cir. 1983); *Rockford Redi-Mix, Inc. v. Teamsters Local 325*, 195 Ill. App. 3d 294, 551 N.E.2d 1333, 1334-41, 141 Ill. Dec. 805 (1990)). In *Marsden*, the Second Circuit held that a work stoppage was unprotected because the employees failed to associate the work stoppage with a specific demand related to the conditions of employment. 701 F.2d at 242-43. In a footnote, the court hypothesized that the strike probably would have been unprotected had it occurred

28

during a delivery of concrete even if a proper demand were made. *Id.* at 242 n.4. This dicta is unpersuasive as it merely cites to *Marshall Car Wheel* without recognizing or fully analyzing the competing principle that strike activity generally will, and must be allowed to, inflict some economic harm including product loss. And in the other case, *Rockford*, an intermediate appellate court in Illinois concluded that a work stoppage by concrete delivery drivers was unprotected because it caused destruction of the trucks and bankrupted the company. *Rockford*, 551 N.E.2d at 1334-40. Although we are not bound by an out-of-state decision, this authority is also unpersuasive because Glacier's trucks were not destroyed during the strike and the loss was more in line with other cases involving merely incidental product damage. The Board has concluded in the context of strikes involving concrete business losses that the fact that conduct brings "inconvenience and economic loss" does not render it unprotected. *ABC Concrete Co.*, 233 N.L.R.B. 1298, 1304 (1977) (internal quotation marks omitted). Given the importance of viewing the work stoppage conduct in its full context, the Board is the proper place to balance the competing principles.

Read together, the relevant Board decisions show that economic harm due to the possibility of a product perishing does not render a strike *clearly unprotected* under section 7. These decisions further recognize that when a strike is done for collective bargaining purposes—which Glacier does not contest occurred in this

29

case—the Board must balance the competing principles in context and "[t]he economic pressure flowing from such a strike must be weighed against the goals sought to be achieved by the strikers." *Lumbee Farms*, 285 N.L.R.B. at 506; *see also Nat'l Labor Relations Bd. v. A. Lasaponara & Sons*, 541 F.2d 992, 998 (2d Cir. 1976) (stating that a work stoppage was a protected strike because, unlike extreme cases of economic coercion like *Marshall Car Wheel*, "the economic pressure . . . clearly failed to reach a degree so grossly disproportionate to the goal sought to be achieved that it renders the conduct unprotected").

To fully analyze whether the conduct is unprotected under section 7 in this case, we would need to engage with the facts as a matter of first impression, balancing the economic pressure against the strikers' legitimate interest. Based on a full factual analysis, we might determine that the strike activity was unprotected because the drivers did not take reasonable precautions to protect Glacier's product or trucks. On the other hand, the strike could also be viewed as protected because the concrete loss was incidental damage given the perishable nature of the concrete. In any event, *Garmon* makes clear that this kind of fact-specific determination is a function of the Board in the interest of the uniform development of labor policy. *See Columbia Portland Cement Co. v. National Labor Relations Bd.,* 915 F.2d 253, 257-58 (6th Cir. 1990) (balancing these competing principles and fully evaluating the facts to conclude that a work stoppage was protected activity when the employees

30

took reasonable precautions to protect equipment even though the equipment was damaged).[9] State court adjudication would potentially interfere with important federal interests. Because it is debatable whether the work stoppage resulting in concrete loss was a protected strike, the drivers' conduct is at least arguably protected under section 7. Therefore, we conclude that the NLRA preempts Glacier's tort claims.

D. Glacier's inability to obtain damages in a Board proceeding supports, rather than undermines, the argument for preemption

Glacier argues preemption of its state tort claims is unwarranted because this would leave it with no remedy for its losses. But *Garmon* rejected the notion that an employer's inability to obtain a remedy undermines a finding of preemption, noting that "[e]ven the States' salutary effort to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are

---

[9] At oral argument, Glacier appeared to acknowledge that the balancing of relevant principles is fact specific. For example, when posed with a hypothetical about a grocery store employee walkout that resulted in the foreseeable loss of perishable fish, Glacier suggested such a walkout might be protected activity because it merely caused "production loss" rather than being intentionally timed to cause the concrete loss as alleged by Glacier. Wash. Supreme Court oral argument, *Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Local Union No. 174*, No. 99319-0 (Sept. 21, 2021), at 32 min., 14 sec. through 34 min., 18 sec., *audio recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org. This distinction does not rest on any categorical or legal difference between the hypothetical facts and the present facts. Instead, Glacier's argument highlights why factual distinctions should be drawn by the Board and not by state courts.

potentially subject to the exclusive federal regulatory scheme." 359 U.S. at 247. In fact, the Court in *Garmon* concluded that the inability of the Board to grant a remedy for losses flowing from arguably protected conduct supports preemption of that claim in state court: "to allow the State to grant a remedy here which has been withheld from the National Labor Relations Board only accentuates the danger of conflict." *Id.*; *see also Wis. Dep't of Indus., Labor & Human Relations v. Gould, Inc.*, 475 U.S. 282, 286, 106 S. Ct. 1057, 89 L. Ed. 2d 223 (1986) (stating that "the *Garmon* rule prevents States not only from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the Act"). This court has expressly recognized that the failure to obtain a remedy is not determinative of *Garmon* preemption. *Beaman,* 116 Wn.2d at 710-11 (citing *Garmon* and noting that "the fact that a given remedy cannot be granted by the [Board] does not necessarily mean his claim is not preempted"). Again, *Garmon* emphasized that it is the "'type of conduct'" involved, rather than the remedy, that is controlling for the preemption analysis. 359 U.S. at 247-48.

Relatedly, Glacier argues that preemption is unwarranted because it has no means of bringing its claim to the Board, insisting that this case is similar to *Sears*. In *Sears,* the Court considered whether a trespass claim for a union's peaceful picketing was preempted because it was either arguably prohibited or protected

under the NLRA.  436 U.S. at 190.  Because the Board's consideration of the union's

picketing would have focused on the objective of the picketing, rather than the

location of the picketing and whether a trespass occurred, the Court concluded that

the controversies presented to the Board and the state court were different.  Thus,

the Court held that the state trespass claim was not preempted under the "arguably

prohibited" prong of *Garmon*.  *Id.* at 198.

However, the Court in *Sears* emphasized the important values preserved by

the preemption doctrine in deciding whether the picketing was arguably protected

under section 7.  Because state courts should not interfere with conduct actually

protected by the act, the Court observed that "[c]onsiderations of federal supremacy,

therefore, are implicated to a greater extent when labor-related activity is protected

than when it is prohibited."  *Id.* at 200.  The Court highlighted the potential overlap

in what the state court would consider and what the Board may eventually consider:

> Prior to granting any relief from the Union's continuing trespass, the
> state court was obligated to decide that the trespass was not actually
> protected by federal law, a determination which might entail an
> accommodation of Sears' property rights and the Union's [section] 7
> rights.  In an unfair labor practice proceeding initiated by the Union,
> the Board might have been required to make the same accommodation.

*Id.* at 201.  Nonetheless, the Court concluded that this potential for overlapping

jurisdiction did not exist in that case, in part because the employer was unable to

have the Board decide whether the trespass was protected.  *Id.*  The Board's

determination of whether the trespass constituted protected conduct would have occurred only if the union had filed a complaint with the Board that the employer had engaged in unfair labor practices. But because the union responded to the employer's demands to leave by stating that it would not cease picketing unless it were forced to do so by legal process, the Court concluded the employer had no "reasonable opportunity to either invoke the Board's jurisdiction . . . or else to induce his adversary to do so." *Id.* The Court therefore held preemption of a state claim was not warranted "over arguably protected conduct when the party who could have presented the protection issue to the Board has not done so and the other party to the dispute has no acceptable means of doing so." *Id.* at 202-03.

*Sears* is distinguishable from this case because Local 174 has filed a complaint with the Board alleging retaliation for the exercise of Local 174 drivers' section 7 rights, and the Board has deferred action pending the outcome of this litigation.[10] Amicus correctly points out that this complaint accentuates the possible conflict with the Board. Br. of Amicus Curiae at 10-14. Local 174's Board complaint alleges

---

[10] The Board's deferral of a complaint is typical while the outcome of a concurrent or underlying state action is pending in state court; deferral does not suggest the Board intends for the state court to exercise jurisdiction over a case involving arguably protected conduct. Instead, it serves the orderly administration of justice. In *Garmon*, for example, the Court concluded that the state court action was preempted even though the Board had completely declined to exercise jurisdiction, rejecting the California state court's conclusion that the Board declining jurisdiction showed that state jurisdiction was proper. 359 U.S. at 238.

34

retaliation by Glacier in response to conduct protected by section 7, in part based on the lawsuit, so the Board will likely need to address the protected section 7 conduct in its decision. While Glacier argues that a state court must first decide the merits of its claims, the summary judgment motion pertains only to the misrepresentation claims, not the property loss claims possibly preempted by the NLRA. *See* Resp't/Cross-Pet'r Glacier's Answer to Br. of Amicus Curiae at 18-20; *Bill Johnson's Rests., Inc. v. National Labor Relations Bd.*, 461 U.S. 731, 737 n.5, 744-47, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983) (noting the Board may enjoin suits that are preempted by federal law). The sole basis for dismissal of the property loss claims is federal preemption, without a merits determination. We hold that those claims involve arguably protected labor activity and are therefore preempted under section 7 of the NLRA.

Having found NLRA preemption of Glacier's claims arising from the August 11 events, we now turn to the three tort claims arising out of the alleged misrepresentation by Local 174's representative, Rick Hicks, following the union's approval of the CBA on August 18.

II.    The trial court properly dismissed Glacier's state claims alleging misrepresentation and intentional interference with contract

The trial court dismissed Glacier's three remaining claims for negligent misrepresentation, fraudulent misrepresentation, and intentional interference with

35

contract at the summary judgment stage. We review summary judgment rulings de novo. *Binschus v. Dep't of Corr.*, 186 Wn.2d 573, 577, 380 P.3d 468 (2016) (citing *Mountain Park Homeowners Ass'n v. Tydings*, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994)). "Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Id.* We view the facts and reasonable inferences drawn therefrom in the light most favorable to Glacier as the nonmoving party. *Id.*[11]

A. Glacier's misrepresentation claims fail because the alleged misrepresentation was a promise of future performance, rather than a statement of existing fact

Glacier's claims for negligent and fraudulent misrepresentation should be treated together because they share a requirement in common that forms the basis of the dismissal for both claims. A fraudulent misrepresentation claim[12] and a

---

[11] As noted, the trial court's ruling was based both on state and federal law. At this stage of the proceedings, no party challenges the Court of Appeals's conclusion that section 301 of the LMRA, 29 U.S.C. § 185(a), does not preempt the tort claims based on Hicks's statements. Moreover, because these claims must be dismissed on their merits under state law, we avoid any possible conflict with section 301 regardless of whether that section may preempt these tort claims.

[12] To prove fraudulent misrepresentation, the plaintiff has the burden by clear and convincing evidence to prove the following elements:

> (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7)

negligent misrepresentation[13] claim both require the misrepresentation to be one of existing fact; a promise of future performance is therefore not an actionable statement. *See Adams*, 164 Wn.2d at 662 (future promise or agreement for the scope of a surgery was not a statement of existing fact for a fraud claim); *see also Havens v. C&D Plastics, Inc.*, 124 Wn.2d 158, 182, 876 P.2d 435 (1994) (statement of existing fact is a prerequisite to a negligent misrepresentation claim).

The Court of Appeals recognized that Hicks's statement was a promise of future performance. But the court did not precisely identify Hicks's statement to GLY President Ted Herb about whether the drivers would respond to dispatch and service the mat pour on August 19. Specifically, the court misquoted Hicks's response to Herb's inquiry as saying, "'the drivers will respond to dispatch.'"

---

plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff.

*Stiley v. Block*, 130 Wn.2d 486, 505, 925 P.2d 194 (1996).

[13] The elements for negligent representation are similar and must also be proved by clear and convincing evidence:

(1) the defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in his business transactions, (3) the defendant was negligent in obtaining or communicating the false information, (4) the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages.

*Ross v. Kirner*, 162 Wn.2d 493, 499, 172 P.3d 701 (2007).

*Glacier*, 15 Wn. App. 2d. at 414. The Court of Appeals may have been quoting Herb's deposition testimony describing how he relayed Hicks's statement to another GLY employee: "I said that I asked him the question on would drivers respond to the pour and was told that the drivers will respond to dispatch." CP at 713. But Herb actually quoted Hicks's statement slightly differently. In response to Herb's question about servicing the mat pour, Herb alleged that Hicks responded in a similar way twice: "'[t]he drivers have been instructed to respond to dispatch'" and "'[w]e have specifically instructed the drivers to respond to dispatch.'" CP at 1648.

Glacier claims the Court of Appeals's misquote carries legal significance because Hicks's actual statement was a statement of existing fact—that the drivers were *instructed* to respond to dispatch—rather than a promise of future conduct. From a purely grammatical standpoint, this may be a fair interpretation, but in context Hicks's alleged statement still expresses a promise of future action, namely that the drivers would service the mat pour. Herb was asked by Glacier to contact Hicks because there were rumors that drivers would not work on August 19, the day after the new CBA was ratified. Both Glacier and GLY wanted assurances that the mat pour would be serviced if it were scheduled. In his declaration, Herb stated he told Hicks that Glacier was "'trying to reschedule the mat pour for tonight and there's some concern about whether it will properly be serviced. So, I have been asked to call and get a response and some information on what will happen.'" CP at

38

1647. Herb's ultimate question to Hicks was "'will you service the mat pour or not?'" CP at 1647. Both Glacier and GLY sought an *assurance* from Hicks as to whether drivers would service the mat pour the next day, not whether he had in fact instructed them to do so. Herb's understanding of Hicks's statement as a promise for future performance was expressed in his deposition in which he stated that Hicks told him the drivers would respond to dispatch. And Glacier's ready-mix sales manager, Greg Mettler, said, "Responding to dispatch means reporting to work. Mr. Herb stated specifically that he had asked Mr. Hicks if the drivers were going to report to work the mat pour, and he was told that they were instructed to do so." CP at 1611. Therefore, considered in context, Hicks's response was a promise for future performance by the drivers to report to work, not a statement of presently existing fact. Absent any false or misleading representation of present fact, Glacier's claims fail as a matter of law.

> B. The intentional interference was not a proximate cause of Glacier's losses

With respect to Glacier's claim for intentional interference with its contract rights, the Court of Appeals correctly recognized that any misrepresentation by Hicks was not a proximate cause of Glacier's losses relating to the cancellation of the mat pour. Generally, breach or termination of the contract is an element of an intentional interference claim. *Leingang v. Pierce County Med. Bureau, Inc.*, 131

Wn.2d 133, 157, 930 P.2d 288 (1997).[14]  However, Washington has recognized that an interference resulting in a more expensive or burdensome performance of a contract may form the basis of an intentional interference claim, and this is what Glacier alleged in its complaint. *See Eserhut v. Heister,* 52 Wn. App. 515, 518, 762 P.2d 6 (1988) (citing RESTATEMENT (SECOND) OF TORTS § 766A)); CP at 19 (Glacier's complaint alleges that the intentional interference made Glacier's performance "more expensive or burdensome.").

We agree with the Court of Appeals that Glacier cannot show proximate cause in this case.  Whether an alleged misrepresentation was a proximate cause of Glacier's losses requires Glacier to show both factual and legal cause. *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 478, 951 P.2d 749 (1998).  Factual cause is met if "but for" the defendant's actions, the injury would not have occurred. *Id.*  The legal causation analysis asks "whether, as a matter of policy, the connection between the ultimate result and the act of the defendant is too remote or insubstantial to impose liability.  A determination of legal liability will depend upon '"mixed

---

[14] The elements of such a claim include:

> (1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage.

*Leingang*, 131 Wn. 2d at 157.

considerations of logic, common sense, justice, policy, and precedent.""" *Id.* at 478-79 (quoting *King v. City of Seattle*, 84 Wn.2d 239, 250, 525 P.2d 228 (1974) (quoting 1 THOMAS ATKINS STREET, FOUNDATIONS OF LEGAL LIABILITY 100, 110 (1906))). The section of the *Restatement (Second) of Torts* discussing legal causation in the context of an interference claim provides further guidance, focusing on whether the alleged losses were within the foreseeable risk of harm created by the misrepresentation. RESTATEMENT (SECOND) OF TORTS § 548A cmt. a (AM. LAW INST. 1977) ("In general, the misrepresentation is a legal cause only of those pecuniary losses that are within the foreseeable risk of harm that it creates."). While proximate cause is generally left to the jury, "where the facts are not in dispute, legal causation is for the court to decide as a matter of law." *Schooley*, 134 Wn.2d at 478.

Viewing the evidence in a light most favorable to Glacier, as we must in reviewing Local 174's motion for summary judgment, there is some evidence that Glacier would not have scheduled the mat pour for August 19 "but for" Hicks's misrepresentation and assurance that the drivers would respond to dispatch. But even assuming Hicks falsely communicated to Herb that the drivers would respond to dispatch, the causal relationship between Hicks's statements and Glacier's losses remains too attenuated as a matter of law. Given the context of the work stoppage and the CBA, the losses due to the canceled mat pour were not a foreseeable result of Hicks's statements.

First, under the terms of the CBA, the losses were not a foreseeable result of Hicks's statements because the drivers were not required to service the mat pour even if they had been instructed to respond to dispatch. Glacier failed to comply with a number of the CBA provisions that would allow it to require the drivers to work a weekend job,[15] and Hicks's statement about instructing the drivers to respond to dispatch did not mention the terms of the CBA, which were known to both Glacier and the union. Second, the losses were not a foreseeable result of Hicks's statement because the union representative lacked the authority to bind the employees to work without regard to the CBA conditions.[16]

While Glacier could have required its employees to work, there is no allegation it took any steps to do so consistent with the CBA. Glacier relies solely on Hicks's alleged statement as the basis for the drivers to report to work, but as recognized this statement could not obviate compliance with the CBA. We affirm

---

[15] The Court of Appeals correctly analyzed the terms of the CBA at length, specifically the CBA's requirements for advance notice and seniority call-out order to force drivers to work weekends. *Glacier*, 15 Wn. App. 2d. at 416-17. Glacier does not dispute the Court of Appeals's conclusion that it failed to comply with the CBA by not providing the requisite notices or calling in the correct seniority order to force drivers to work the mat pour on August 19.

[16] Melanie O'Regan, vice president of Glacier, stated in her declaration that Local 174, through Hicks, has control over whether drivers will return to work following a work stoppage. Accepting as true that Hicks had control over when the strike ended, Local 174 did not control the conditions under which drivers would be offered jobs or would take jobs once the strike had ended because that is governed by the CBA. It appears that at least some of drivers also had the understanding that they were not required to report to the mat pour that night.

the lower court's summary judgment dismissal of Glacier's intentional interference claim.

CONCLUSION

We reverse in part and affirm in part the decision of the Court of Appeals. Specifically, we hold that the NLRA preempts the property destruction claims because the concrete damage occurred incidental to a work stoppage and was therefore at least arguably protected under the NLRA. Summary judgment of dismissal is therefore appropriate as to those claims. Dismissal is also appropriate as to the remaining claims for misrepresentation and intentional interference because Hicks's statements were a promise for future performance, and Glacier cannot show that Hicks's statements proximately caused its losses. We remand this case to the trial court with instructions to dismiss Glacier's claims consistent with this opinion.

Stephens, J.

WE CONCUR:

González, C.J.

Gordon McCloud, J.

Johnson, J.

Yu, J.

Madsen, J.

Montoya-Lewis, J.

Owens, J.

Whitener, J.